In the Matter of the STATE OF NEW YORK, by LOUIS J. LEFKOWITZ, Attorney-General of the State of New York, Petitioner, *v.* ITM, INCORPORATED, et al., Respondents.

Supreme Court, Trial Term, New York County, September 29, 1966.

*Louis J. Lefkowitz, Attorney-General (Mark T. Walsh* and *Thomas F. O'Hare* of counsel), for petitioner. *Rubin Sterngass,* respondent in person. *M. Nathan Cember* for ITM and others, respondents.

HYMAN KORN, J. This is a special proceeding brought on behalf of the State of New York by the Attorney-General, pursuant to subdivision 12 of section 63 of the Executive Law which, so far as pertinent, reads: " Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney-general may apply * * * for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts * * * and the court may award the relief applied for or so much thereof as it may deem proper. The word ' fraud ' or ' fraudulent ' as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretence, false promise or unconscionable contractual provisions."

The respondents are two domestic corporations, ITM, Incorporated (hereafter referred to as ITM), and Gilbert Industries, Inc. (hereinafter referred to as Gilbert); the sole stockholder of both corporations, Rubin Sterngass; the president of both corporations, Joseph Granda; the sales manager of both corporations, Joseph D'Agostino, and three salesmen, Robert Christe, Gordon Hilton and George Brown.

The petition contains two causes of action, the first against the two corporations; and the second against the individual respondents. The Attorney-General seeks an order enjoining, restraining and prohibiting the respondents from further engaging in the fraudulent and illegal practices alleged in the petition.

The answer of the respondents generally is comprised of the usual denials and two affirmative defenses are interposed. The first challenges the constitutionality of subdivision 12 of section 63 of the Executive Law, and the second questions the good faith of the Attorney-General in commencing this proceeding.

A preliminary injunction was heretofore granted by Mr. Justice SCHWEITZER, who ordered a plenary trial.

The corporate respondents claim they are engaged in the business of selling color television sets, central vacuum cleaning systems, and electronic quartz broilers to consumers at their homes, by a sales method known as a " referral-sales program." Basically, this program consisted of inducing a consumer to sign

a retail installment contract containing time payments for the purchase of one of the products and the execution of an additional commission agreement providing for payment to the consumer of an agreed amount for each sale resulting from the submission of names of potential customers or referral by that consumer to the respondents. The latter agreement contained a further provision that guaranteed remuneration to the consumer for referring 20 names to the respondents and having a " presentation " made to them of the respondents' products.

Since all the transactions involved time payment plans, they are governed by the provisions of section 401 *et seq.* of the Personal Property Law (the Retail Instalment Sales Act).

The petition states that the respondents had intentionally devised a scheme and method of operation aimed at defrauding and obtaining money from the consuming public of this State, because of certain false and fraudulent representations made by the respondents concerning both the products involved and the referral scheme utilized in the promotion of the sales of their products. The respondents are accused of inducing the consumers to execute retail installment contracts requiring the purchasers to pay exorbitant and unconscionable prices for the products involved by reason of fraudulent statements. After the consumers executed the contract, immediate delivery of the products was made and these contracts were immediately sold to finance companies and banks.

The petitioner maintains the documentation employed by the respondents to evidence these transactions was in direct violation of the provisions of subdivision 2 of section 402 of the Personal Property Law, in that the retail installment contract and the commission agreement (and also, other agreements) were kept separate and apart in contradistinction to the statute's mandate that the contract contain the entire agreement. This procedure, it is claimed, gave immunity to finance companies who purchased the contracts without the " referral sales agreement ".

The Attorney-General's further contention is that the contracts were unconscionable within the meaning of section 2–302 of the Uniform Commercial Code and subdivision 12 of section 63 of the Executive Law, and are unenforcible.

The petitioner further charges the respondents with persistently transacting business in this State through an unlicensed foreign corporation, and alleges that this would bar any action to enforce the contracts in those transactions, and that they be enjoined from doing so. And in addition, it is claimed that the respondent Sterngass illegally utilized a domestic corporation,

Quartz Unlimited of North America, Inc., to conduct the business of a sales finance company without being duly licensed to do so.

The respondents deny making misrepresentations and fraudulent statements in the conduct of their business. They urge that the law requires in such cases that the proof of such fraud must be clear and convincing. They maintain that the documents used in the transactions complied with subdivision 2 of section 402 of the Personal Property Law, and that the "referral sales program" as employed herein, was proper and legal in every respect.

During a lengthy trial, numerous witnesses appeared in behalf of the petitioner, most of them consumers, representatives of finance companies, banks, governmental agencies, suppliers of products involved, and former salesmen of respondents.

Testimony was adduced concerning two other "selling" corporations (not respondents here): Products Presentations, Inc., a domestic corporation and a foreign corporation of the same name. Respondent Sterngass was the sole stockholder of both corporations. Products Presentations, Inc. (N. Y.) was located at the same address as ITM and Gilbert. Granda was its president and D'Agostino its salesman. Hilton and Christe were likewise salesmen employed by this corporation. In its business it utilized the referral-type sales program and dealt in central vacuum cleaner systems and broilers.

Products Presentations, Inc. (Conn.) was unauthorized to do business in this State. D'Agostino was also its president and Hilton and Brown, sales representatives. It likewise fostered the referral-type program and dealt in color television combination sets.

The testimony of Sterngass, the sole stockholder of all four corporations, proves that the same basic pattern of doing business was followed by all four corporate entities and the individuals connected therewith. On September 29, 1964, Products Presentations, Inc. (N. Y.) executed an assurance of discontinuance to the Attorney-General. Following this, business declined and the activities of this corporation were abandoned. ITM (incorporated January 20, 1965) took up and continued to do business in a similar manner. When public reaction incident to the investigation by the Attorney-General of ITM, in July, 1965, caused the business of this corporation to fall off, respondents continued its former practices under the auspices of Gilbert.

In January, 1966, the respondents ceased doing business as Gilbert and commenced doing business as "Gilbert Indus-

tries ", a trade name for which a certificate to do business was filed in Connecticut by Products Presentations, Inc. (Conn.). No license to conduct such a business in New York was ever obtained. Whatever corporate facade was used is relatively unimportant, the " dramatis personae " remained the same.

The proposed consumer having been referred by a prior " enrollee " in the plan, first received either a telephone call or a note from said enrollee. The respondents had already furnished the enrollee with the script to be followed if the contact was by telephone, and a form letter, if contact was to be by mail.

Both the telephone script and letter emphasized only the money-making aspects of an offering to be made by respondents. These forms said nothing about the sale of any product, nor did they even attempt to explain what the contract was all about.

The appointments were arranged through telephone calls made by employees at the respondents' office. In these conversations they gave no indication of the purpose of the appointment. The witnesses testified that when a respondents' representative called, usually between 7:30 to 10:00 P.M., they were unaware of the purpose of the visit except that a " profitable " or " money-making " plan was to be discussed.

The representative of the respondents would generally start with a discourse about deficiencies in the effectiveness of television, radio and newspaper advertising; and about how the high cost of such advertising resulted in price escalation for the product so advertised. Then came the revelation of the " Consumers Coop Advertising Program "; and the " salesman " would produce a blank form used to show the " Money Tree " of earnings under the respondents' commission agreements.

The respondents varied the plan at different times, basically using two programs. The first, known as " two-step plan ", used from January, 1965 to April, 1965, provided that the consumer would receive a $50 commission for each prospect who was referred by the consumer to the respondents and who became an enrollee and would also receive another $50 commission for each person whose name was referred who in turn enrolled in the plan.

After April, 1965, the respondent corporations used a one-step commission program by which the enrollee would earn $50 for each of the first three enrollments, $200 for the fourth, $50 each for the next three, $400 for the eighth, $50 each for the next three, and $1,200 for the twelfth. Some agreements provided for payoff of the retail installment contract on the eighth successful contact and $1,000 for the twelfth. There was no

agreement in the one-step program to pay the primary enrollee for enrollments made as a result of referrals by those he enrolled.

With each of the plans, there was allegedly at least one guarantee. This provided that each enrollee would receive at least $300 provided: (1) the enrollee submitted 20 or more names, and (2) the respondents made presentation appointments with 20 such named persons, even if none of them enrolled. At times merchandise such as a freezer, a mink stole, $1,000 worth of goods and wares, expensive hi-fi and stereo equipment or a color television set were substituted as the reward.

In some cases a "supplemental" bonus appointment certificate was given which provided for the payment of an extra bonus of $200 for 10 additional names and appointments after the first 20 appointments were completed. However, in all cases the continual emphasis was upon the submission of the first 20 names.

Under the two-step program the consumer-witnesses were told they could earn as much as $9,000, could pay off the house mortgage, and could make a $1,000 profit (after the product was paid for) to cover outstanding medical bills, among other things, and that the earnings were unlimited.

Although the earnings payable under the one-step program appear to be likewise unlimited, the testimony of the witnesses, fortified by the documentary evidence, clearly shows the accent on the sum of $2,250.

The testimony of almost all of the consumer witnesses is to the effect that they were told by the respondents that 6 to 7 successful enrollments would be produced from every 10 names referred. They were told that they would never have to pay the price of the product out of their own pockets; that the price would only be paid out of commissions, and they would still make a profit.

The order of procedure utilized at the "presentation" was as follows: (1) discussion and signing of commission agreement, (2) execution of credit statement, (3) execution of retail installment contract, (4) installation order, (5) congratulatory letter of enrollment given to consumer.

The appointments with prospects would usually be for the evenings. The representative would stay at the consumer's home for a period from one and a half to as many as five hours. The "salesman", as instructed, would use every argument available to convince the prospect of the wonderful program being fostered by his employer and the great opportunity that the prospect is tendered by accepting it. When requested to

leave the documents for perusal or to return on another occasion, the reply was that this was not possible. It was either now or never.

The representatives were trained to use a "canned sales pitch". This was not only proven by the testimony of the consumer-witnesses, but also by the testimony of respondent Hilton, who further testified that the commission agreement was the first paper signed. His testimony confirmed the statements of every consumer-witness that payments would be made only from commissions.

It is apparent that the sole inducement which led the consumers to execute the various documents involved in these pitiful transactions was the money-making scheme misrepresented to them by the respondents.

Respondents fraudulently represented:

(1) That none of the products offered would cost the consumer any money. They were told they would never have to pay the "prices" recited in the installment contract out of their own pockets; that they would be paid from the commissions earned.

(2) That they were national advertising organizations engaged in advertising promotion.

(3) That the respondent Gilbert was the famous toy manufacturer listed on the stock exchange.

(4) That they were promoting the various products sold by a "word-of-mouth" campaign advertising the products through owners of the product instead of using the conventional methods of advertising by radio, television, newspapers and magazines, so that such owners would get the deserved benefit and gain that would otherwise be paid to advertising media.

(5) That commissions would be paid according to the terms of such commission agreements, bonus and supplementary bonus appointment certificates and the guarantees of $300 for appointments with 20 referrals.

(6) That the referral plan was a definite money-making proposition, and that the consumers did and could earn thousands of dollars from it, thus receiving the product without any cost.

(7) That from 40% to 90% (mostly, however, 6 or 7 out of every 10) of the named referrals had been and would be converted to successful enrollments.

(8) That the retail installment contract was only a formality for the delivery of a demonstration model and was only necessary to ensure the payment of commissions.

(9) That the products were to be delivered on a trial basis and the program could be cancelled at any time.

The representation that the respondent corporations were national organizations engaged in advertising promotion was totally controverted by the testimony. The representation as to the identity of Gilbert as the famous toy manufacturer is false on its face and its falsity is buttressed by the respondents' failure to deny in their pleadings its mendacity.

The testimony of Mr. Lyons, the Chief Accountant of the Bureau of Consumer Frauds of the Office of the Attorney-General, conclusively proved the mathematical certainty by which the respondents' referral plan was doomed to failure, knowledge of which must be charged to the respondents. He demonstrated that, based on respondents' own representations that respondents had converted and could convert every 20 names furnished by each consumer into 12 enrollments, the plan would follow a geometric progression, so that by the seventh stage it would involve millions of people purchasing these items in untold millions of dollars. If carried on further it could well exceed the population of the State, Nation and indeed the world.

Depending on the size of the sales force available to respondents, and the territory available to them, somewhere along the line, the plan had to fail as a matter of economic feasibility and mathematical certainty. No matter the junction at which this was reached, the number of latest participants would grossly exceed the sum of the participants of all prior grounds. It is patent that by far the greater number of participants could earn no commissions.

This is the vice and quicksand nature of " endless-chain " transactions. And it is so apparent that the promoters must be charged with knowledge of the fraud inherent in it. As was cogently stated in *McNamara* v. *Gargett* (68 Mich. 454, 459–460), a case involving an " endless chain " plan: " The very scheme itself bears evidence upon its face that it is a fraud and a snare, and yet so cunningly devised that, in the hands of a sharp, shrewd, and designing man, hundreds of the unwary have been defrauded; and the courts should set their seal of condemnation upon it, and pronounce it, as it is, a contract void on the ground of public policy."

Other courts have similarly held. In Wisconsin (*Twentieth Century Co.* v. *Quilling*, 130 Wis. 318, 324–325), the court held: " Such an [endless-chain] enterprise we regard as contrary to public policy and void. Any contract which contemplates or necessarily involves the defrauding or victimizing of third persons as its ultimate result must be *contra bonos mores* [citing cases in Michigan, Iowa, Indiana, Ohio and Ontario]."

While the futility of the "endless-chain" plan is obvious to the promoters, it is not apparent to the consumer participant. That enrollment within the first four rounds can earn commissions is entirely possible and credible. As was said in *New* v. *Tribond Sales Corp.* (19 F. 2d 671, 673–674), where an endless-chain scheme which would involve 516,560,852 sales by the fifteenth round was condemned: "While it is unlikely that the chain would progress to such an extent in any locality, it is apparent that the extent to which a chain has progressed in a given locality, will have material bearing upon the ability of ' contract ' holders to dispose of coupons, through the narrowing of the field of possible purchasers. It is practically impossible for a ' contract ' holder to obtain any advance information in this connection, but the appellee [promoter] is much more advantageously situated in this respect."

The rule is clear that where one party to a transaction has superior knowledge, or means of knowledge not open to both parties alike, he is under a legal obligation to speak and his silence constitutes fraud (*Noved Realty Corp.* v. *A. A. P. Co.*, 250 App. Div. 1; see, also, *Rothmiller* v. *Stein*, 143 N. Y. 581; *D'Allesandra* v. *Manufacturers Cas. Ins. Co.*, 106 N. Y. S. 2d 564).

There was duty on respondents to disclose each consumer's respective standing in the geometric progression of the endless chain. Suppression of this fact constituted a fraudulent practice tantamount to a false representation for the purpose of inducing consumers to participate in the referral plan of the respondents.

The evidence clearly showed that the plan was not the money-making proposition as stated to the consumers. Lyons' testimony, which was uncontradicted and was substantially based on respondents' own records, well illustrated the fraud perpetrated on the consumers. None of the consumers earned "thousands of dollars". In only two instances did a consumer earn enough commissions to pay in full for the product involved. There are well over a hundred instances in which no commissions were paid or in which only a $50 advance commission was paid as "bait".

In addition, to negate the efforts of the consumers to earn their commissions, names submitted to respondents were deliberately overlooked. The respondents in some instances did not pay commissions, or failed to pay the promised $300 for submission of 20 names. In further attempts to avoid honoring their obligations under the referral plan, the respondents switched the products they were selling, thereby making it

difficult for a consumer to recommend prospective customers. In no instance did ITM or Gilbert pay the gift bonuses as promised. Based on this factual experience, the representations made by the respondents concerning the referral plan as recited heretofore were false.

The testimony of respondent Sterngass bolsters this. Referring to records of ITM, he stated this respondent made a total of 223 sales. Of these, 99 enrollees received commissions, 124 did not. The total commissions were $16,115. One individual earned $2,000 consisting of a " three-way stereo color combination " as a bonus, valued at approximately $1,100, plus $900, $1,000 or $1,100 in cash. This was unsupported by any documentary evidence. This indicated 98 customers out of 222 shared $14,000, obviously far less than was represented to the consumers.

With respect to Gilbert, the witness testified that of 126 sales, 115 consumers received commissions of $10,250, constituting an average of less than $100 each. It is conclusively shown that by far the great majority of these commissions were $50 " advance " commissions. These were unearned and represented lure that snared the consumers into entering the plan.

With regard to the representations that the retail installment contract was not really a contract at all, but was a mere formality for delivery of a demonstration model, and that the products were delivered on a trial basis during which time the program could be cancelled, both the testimony of the witnesses and the actions of the respondents in enforcing payment of the retail installment contract, or the penalty clause recited in the installation order proved beyond cavil that said representations were completely spurious.

It is clear that the referral sales scheme was basically a fraudulent scheme and that the representations made concerning it were factually false and misleading.

The respondents likewise made numerous misrepresentations in regard to the products involved. It was alleged that the electric broiler could only be acquired through the respondent ITM and that it would not be available elsewhere on the market for another three to five years. In fact, however, the manufacturer of the broiler units distributed them through other outlets for ultimate retail sale.

The broiler was represented to cook faster and better than conventional ovens; without any spitter or spatter; and that it is smokeless, does not throw off heat and uses less electricity to run than conventional ovens use. The testimony established

that the broiler does not cook faster than conventional ovens; that the broiler does spitter and spatter; that the broiler does give off considerable and unbearable smoke; that the broiler does not use less electricity and fails to function adequately.

The representatives acted in a most charlatan manner. They recklessly and flagrantly stated that use of the broiler would prevent cancer and heart disease. A photographic copy of a newspaper clipping plus a list of doctors attesting to this were utilized to emphasize this gross distortion of the truth.

The respondents contended that proof of fraud must be clear and convincing. The petitioner maintains that the measure of proof required is a fair preponderance of the evidence. It is academic in this case to discuss this question, for the court finds that the evidence demonstrates that the proof of fraud is most clear and convincing. The essential elements of fraud, namely, a representation, its falsity, *scienter*, reliance and damage were established by more than ample proof.

Respondents' counsel introduced into evidence copies of a so-called Public Relations Report, a sheet containing questions with spaces providing for " Yes " or " No " answers to be made by check marks. These were presented for signature by the consumers. The court finds that this was another document obtained by trick and deceit from the consumers in respondents' efforts to insulate and protect them, if need be, from legitimate and well-substantiated defenses on the part of consumers.

After the execution of the documents on the night of the appointment, three things happened with lightning speed: (1) delivery of the products early the following morning. At this time the installer obtained a signed delivery slip. The obvious purpose of such speedy delivery was twofold: (a) to effectuate a *fait accompli* with regard to the transaction to avoid any prospective difficulties when the consumer became aware of what actually was involved and (b) to obtain evidence of delivery necessary for the respondents to secure the " fast buck " of the finance company, when the retail installment contract was assigned; (2) the visit of the public relations representative, a few days after delivery. In addition to securing consumer signatures to the report previously discussed, he delivered the telephone script and form letters, and advised the consumers in the method of obtaining new enrollees. Until his visit, the consumers were adjured to do nothing more than prepare a list of names. They were cautioned not to make any contacts until then. They were instructed to call the office of the respondents and furnish additional names.

In the interim, (3) the retail installment contract was assigned to a finance company or bank. There is no doubt that prior to September 1, 1965, this document was separated from all the other papers, except the credit application and evidence of delivery. This did not include the commission agreement, bonus appointment certificate and installation order, all containing essential terms of the agreement between the consumer and the respondents. In short, the respondents assigned incomplete instruments to the finance company, although these instruments appeared complete on their face.

After September 1, 1965, it appears that respondents assigned to Gerdon Credit Corp. both the installment contracts and the commission agreements. There is, however, no proof that any additional papers, such as the bonus appointment certificate or installation orders, were assigned. Again, it appears the respondents were assigning incomplete instruments.

Any attempts made by consumers to cancel contracts, even as early as the very next day, before any delivery of a product was made, were met with threats to enforce the penalty clause (20% of the contract price) contained in the installation order. Following delivery, rigorous enforcement of the contract was the rule. After the consumer received the customary notice of assignment from the bank or finance company, allowing 10 days for the consumer to complain, any complaint was met with ugly and unscrupulous threats to garnishee and to cause consumers to lose their jobs and the institution of lawsuits.

This unprincipled conduct on the part of the respondents caused the consumers to realize how badly they had been swindled. They could receive no satisfaction from the respondents. They did not and could not obtain reports as to the success or failure of the referrals.

All the finance companies and banks appeared on the witness stand by their appropriate officers except Gerdon Credit Corporation.

Those witnesses who did appear testified they discontinued doing business with respondents when they learned the type of business being conducted by respondents and when collection difficulties beset them. The finance companies participated in the conduct of a business which, to say the least, was not of good moral standards. The fact that the installment contracts the finance companies purchased called for the payment of over $900 for a simple home kitchen cooking broiler, or over $1,500 for a color television set, or almost $1,000 for a vacuum cleaner, should have aroused their suspicion from the inception. A

degree of callousness is displayed here, perhaps occasioned by an avaricious desire to participate in this lucrative scheme, and in the circumstances is inexcusable.

The courts were burdened with a tremendous volume of litigation. No respect was shown for the simple requirements of law and procedure. In case after case, it was proven that default judgments were obtained which were based on "sewer service" and on perjured "military affidavits". An investigation into the extent, nature and responsibility for the ease with which this violation of due process of law occurred is indicated.

It is difficult to conceive of a more deliberately fraudulent and maliciously dishonest pattern of doing business with the public. They gorged themselves on their ill-gotten gains from highly credulous consumers. They engaged in practices in which duplicity was the keynote and fraud the keystone of a commercial enterprise designed to pillage the public. None has the right to earn his livelihood in this fashion. The Attorney-General not only had the right, but the most imperative duty to bring this action. The record clearly established the respondents were given every opportunity to defend themselves. The trial satisfied every requirement of due process and equal protection of the law.

The first affirmative defense challenges the constitutionality of subdivision 12 of section 63 of the Executive Law. It is, of course, well established that legislative enactments carry a strong presumption of constitutionality (*Paterson* v. *University of State of N. Y.*, 14 N Y 2d 432), and that unconstitutionality must be demonstrated beyond a reasonable doubt before judicial findings of invalidity may be made (*Matter of Van Berkel* v. *Power*, 16 N Y 2d 37). There was no proof offered to support the claim of the unconstitutionality of the statute. Legislation designed to protect the consuming public against persistent fraud and illegality is certainly considered the rightful domain of the State and the wrongdoer will not be heard to shield himself behind the cloak of alleged unconstitutionality of a meritorious statute. This affirmative defense is without foundation and is dismissed.

The second affirmative defense, alleging improper motives and bias on the part of the Attorney-General of the State of New York in commencing and prosecuting the action against these respondents, likewise has absolutely no merit. Under the facts here proved, the Attorney-General was within his rights and sworn duty to pursue this proceeding vigorously, which he did. Whatever special motive the respondents conjectured he may

have had would be absolutely immaterial in a context of this nature. Indeed, it is meritorious and commendable that the Attorney-General, the members of his staff, including the Bureau of Consumer Frauds, have responded with diligence and alacrity in the investigation and prosecution of this case.

The evidence conclusively establishes the persistent, fraudulent conduct of the respondents. And this, as heretofore stated, has been shown by clear and convincing proof and requires the granting of the relief requested in the petition.

The court will consider the claim of the fraudulent and unconscionable prices charged to consumers.

The following table is most illuminating:

| PRODUCT | UNIT COST | RETAIL MARKET PRICE | RESPONDENTS' CASH PRICE | RESPONDENTS 3-YEAR TIME PRICE |
|---|---|---|---|---|
| Model 200 Broiler.............. | $80 | $199 | $499 | $658.08 |
| Model 300 Broiler.............. | 120 | 299 | 699 | 910.08 |
| Central Vacuum Cleaner....... | 140 | 350–400 | 749 | 920.52 |
| Color TV Set (Average)....... | 450 | 600–650 | 999 | 1,292.40 |
| (Prices inclusive of installation costs)............ | | | 1,099 | 1,418.76 |
| | | | 1,199 | 1,575.00 |

As indicated in the table, the prices charged in the retail installment contracts varied from two to six times the cost of the units to respondents. The respondents, although arguing that the cost price to them should include other charges, such as delivery and installation charges, produced no testimony as to composition of these items.

The respondents fraudulently misrepresented that the products were not obtainable elsewhere at these prices. The goods were available elsewhere and at much lower prices. It is clear that these excessively high prices constituted "unconscionable contractual provisions" within the meaning of subdivision 12 of section 63 of the Executive Law (see *Miami Tribe of Oklahoma* v. *United States*, 281 F. 2d 202). But, even if the prices charged were not unconscionable per se, they were unconscionable within the context of this case. Subdivision (1) of section 2–302 of the Uniform Commercial Code reads as follows: "(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

The facts in this case fall within the scope of the principles enunciated in *Williams* v. *Walker-Thomas Furniture Co.* (350

F. 2d 445 [1965]) where the court refused to enforce a contract as unconscionable under the provisions of section 2–302 of the Uniform Commercial Code.

In *American Home Improvement* v. *MacIver* (105 N. H. 435 [1964]), the Supreme Court of New Hampshire refused to enforce a contract unconscionable on grounds of price alone. There, for goods and services valued at $959, the defendant was charged $1,609.60, plus time and insurance charges of the type charged here, bringing the total to $2,568.60, payable in 60 payments of $42.81 per month. The court held that the contract should not be enforced because of its unconscionable features. The same disparity exists in the transactions in the instant case to clearly render such transactions unconscionable and when the deceptive practices are also considered, there can be no doubt about the unreasonableness and unfairness of these agreements. No longer do we believe that fraud may be prepetrated by the cry of *caveat emptor*. We have reached the point where "Let the buyer beware" is a poor business philosophy for a social order allegedly based upon man's respect for his fellow man. Let the seller beware, too! A free enterprise system not founded upon personal morality will ultimately lose freedom. We also believe that it is right, proper, just and equitable to tell the consumer, clearly and adequately, that he is entering into a contract and that he is personally liable for the entire contract price and that he will be required to make stipulated monthly payments, plus carrying charges, etc., in language that the least educated person can understand. And if he chooses not to do so, but instead lures an innocent person into a predicament where a heavy obligation is incurred due to the fraudulent means exercised by the representative, should the innocent victim suffer and hold harmless the seller and thereby reward him for his highhanded conduct?

This court consequently finds these contracts are unconscionable within the meaning of both subdivision 1 of section 2–302 of the Uniform Commercial Code and subdivision 12 of section 63 of the Executive Law and the respondents should be enjoined both from inducing consumers to execute them or in any way enforcing, or aid in enforcing them through their agents or attorneys.

It is petitioner's contention that the documentation of these transactions as framed by the respondents is in violation of subdivision 2 of section 402 of the Personal Property Law.

The instruments involved herein are (1) a retail installment contract; (2) a commission agreement; (3) a bonus appointment

certificate; and (4) an installation order (which contained a penalty clause of 20% in case the consumer cancelled the agreement prior to installation or delivery). All of these were separately but concurrently executed on the same occasion. They are all part of the same contract and must be construed and read together as one (*Nau* v. *Vulcan Rail & Constr. Co.*, 286 N. Y. 188; *Durst* v. *Abrash*, 22 A D 2d 39; 10 N. Y. Jur., Contracts, § 213).

Subdivision 2 of section 402 of the Personal Property Law, prior to the amendment, effective September 1, 1965 (L. 1965, ch. 872) read: " 2. A contract or obligation shall contain the entire agreement of the parties with respect to the goods and services, and ".

Chapter 872 of the Laws of 1965 amended the provision, retaining the foregoing quoted words and adding language to the effect that (1) promises to the buyer to compensate him for referrals must be contained in the contract and (2) the contract must contain a clause permitting compensation earned to be deducted from the outstanding balance otherwise due under the contract or obligation.

It is without question that the installment agreement should contain and include the commission arrangement, bonus appointment certificate and the penalty clause provided for in the installation order in a single instrument. The provisions of the amendment do not permit mere incorporation by reference — the mandate is " shall contain " and " must contain ".

This is reinforced by the legislative and judicial history of section 402 of the Personal Property Law. The statute was passed in 1957 to correct abuses in the field of installment plan selling, for the protection of the buyer (see Memorandum of Consumer Council to the Governor, 1957, " An instalment sales plan is illegal if it does not conform to the provisions of the law ", McKinney's Sessions Laws of N. Y., 1957, pp. 2113, 2114).

As originally written subdivision 2 of section 402 read as heretofore quoted above. The court, in *Matter of Finkelstein* (11 Misc 2d 938 [1958]), held that the use of a separate instrument to contain a term of the agreement violated subdivision 2 of section 402 of the Personal Property Law. (See, also, 1957 Atty. Gen. 147.)

The respondents' contention that it was not until the 1965 amendment that they were required to incorporate the commission agreement is specious. In enacting the amendment the Legislature repeated the exact words of the original statute, then added the rest of the language of the first sentence of subdivision 2 to identify the particular kind of agreement to which the

whole of the second sentence applied. The second sentence specifically requires that such a contract must contain a clause permitting a buyer to offset commissions against the amount owing under the contract. This can only be interpreted to mean that the amendment was declarative of existing law, as decided in *Matter of Finkelstein* (*supra*).

The legislative intent to outlaw the use of an obfuscating series of documents to evidence a single purchase retail installment transaction, whether executed concurrently or at different times is absolutely clear from the design of the entire statute.

The respondents' practice in not having the instrument contain the commission agreement had an obvious purpose. The commission agreement called for respondents' performance for more than the period set forth under section 403 (last unnumbered paragraph of subd. 3) of the Personal Property Law. This subdivision provides for the survival of defenses arising out of the nonperformance by the seller of any of the terms of the contract, even as against an assignee who mails notice of the assignment, provided that performance of the seller under the contract is to endure for a period greater than 10 days after such notice is mailed.

By assigning to the finance company only the incomplete retail installment contract, the respondents put the finance company in a position of claiming it had no knowledge that such performance was to last beyond the required period of 10 days. By this subterfuge the respondents deliberately and intentionally deprived the consumers of their rightful defenses against payments under the retail installment contract.

To permit an interpretation of subdivision 2 of section 402 of the Personal Property Law consonant with that advanced by the respondents would be to thwart the legislative intention with respect to the last unnumbered paragraph of subdivision 3 of section 403 of the Personal Property Law. No rule, no statutory interpretation or decision calls for this. On the contrary, every section of the statute should be construed in connection with each other to obtain congruity. (*Ex Parte Public Bank*, 278 U. S. 101, 104; *Gwynne* v. *Board of Educ.*, 259 N. Y. 191.)

The court finds that the 1965 amendment required indivisible incorporation of the commission agreement in the installment contract. It further finds that the practices of the respondents in inducing the consumer to sign physically separated commission agreements, bonus appointment certificates and installation orders containing penalty clauses were in violation of the provisions of subdivision 2 of section 402 of .the Personal Property

Law, and are illegal. *Both prior and subsequent to the 1965 amendment of this statute, all of the agreements should have been incorporated in one document.*

The petitioner provided the respondents' attorney and the court with copies of the recent decision of the Supreme Court of the State of Washington, which unanimously held a similar scheme as in the instant case to be a lottery (*Sherwood & Roberts — Yakima v. Leach,* 409 P. 2d 160 [Wash.]).

At the close of the trial, petitioner moved to amend its pleadings to conform to the proof, pursuant to CPLR 3025 (subd. [c]) and contended that, as a matter of law, the plan or scheme of the respondents constituted a lottery. The determination in granting or denying a motion to amend the pleadings to the proof is one within the discretion of the court. The motion is granted.

In the *Leach* case (*supra*) the court points out that the Constitution (State of Washington, art. II, § 24), forbids the Legislature of that State from ever authorizing any lottery.

The Constitution of the State of New York has an even stronger proscription of lotteries. It is contained in the Bill of Rights, section 9 of article I, and so far as pertinent reads: " no lottery \* \* \* shall hereafter be authorized *or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section."* (Emphasis supplied.)

This provision is, if anything, even stronger than its Washington counterpart. The interdiction is not only against the exercise of a legislative power, but the words " or allowed " apply to the judicial and executive branches, as well. The Legislature is not merely prevented from authorizing a lottery but also directed (" shall pass appropriate laws ") to prevent lotteries.

The State of Washington has the following definition of a lottery: " A lottery is a scheme for distribution of money or property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether it shall be called a lottery, raffle, gift enterprise, or by any other name, and is hereby declared unlawful and a public nuisance." (Rev. Code of Wash. 9.59.010.)

New York's statute reads: " A ' lottery ' is a scheme for the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise or by some other name." (Penal Law, § 1370.)

Section 1371 states: " A lottery is unlawful and a public nuisance."

The wording of these sections is exactly the same as the Washington statute (*supra*) except the latter has the words " money or " immediately before " property ". However, this is of no significance, for our Court of Appeals has construed " money " to be property within the meaning of our Penal Law (*People* v. *Hines,* 284 N. Y. 93, 101).

Both statutes contain the traditionally and universally recognized elements of a lottery, i.e., consideration, prize (distribution of property), and chance. In *Hull* v. *Ruggles* (56 N. Y. 424, 427) the court held: " Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out to the public, what and how much he who pays the money is to have for it, that is a lottery."

The laws of New York prohibiting lotteries apply not merely to pure gambling operation (*People* v. *Hines, supra*), but also to business operations conducted as lotteries. The courts of New York have consistently struck down schemes where the underlying purpose was to increase business (*Hull* v. *Ruggles, supra*; *People ex rel. Ellison* v. *Lavin,* 179 N. Y. 164; *People* v. *Miller,* 271 N. Y. 44; *Carl Co.* v. *Lennon,* 86 Misc. 255).

In the *Leach* case (409 p. 2d 160 [Wash.], *supra*) the court said, at page 162: " Appellant argues that since the purpose of the referral agreement is to provide Lifetone with prospective purchasers, the agreement is not a lottery. This is not so. If all the elements of a lottery are factually present, it is a lottery. The essential elements as set forth in RCW 9.59.010 are: ' (1) the distribution of money or property [prize]; (2) chance; and (3) a valuable consideration paid or agreed to be paid for the chance.' *State* v. *Danz,* 140 Wash. 546."

A leading case dealing with the subject of lotteries in New York is *People ex rel. Ellison* v. *Lavin* (*supra*). There the court, after finding that " Doubtless the purpose * * * was to increase the sale of its various brands of cigars " (p. 167), held that the purpose of the plan did not excuse the defendant: " But the prohibition and regulation of gambling in all forms and lotteries of every kind are unquestionably valid exercises of legislative power, and if the scheme established by the advertiser was in effect a lottery, the fact that the dominant purpose was merely to increase the advertiser's business does not save it from condemnation." (p. 168.)

In the *Leach* case (*supra*, p. 162–163) the court, discussing the precise scheme involved in the case at bar, said:

"Here, as part of a general operation, respondents may obtain commissions (prize) and they have agreed to pay the purchase price of the equipment (consideration) in an effort to get that prize. The next question is whether that effort is based on chance."

\* \* \*

"Chance within the lottery statute is one which dominates over skill or judgment. The measure is a qualitative one; that is, the chance must be an integral part which influences the result. The measure is not the quantitative proportion of skill and chance in viewing the scheme as a whole. (State ex inf. *McKittrick* v. *Globe-Democrat Publishing Co.*, 341 Mo. 862, 110 S.W. 2d 705, 113 A. L. R. 1104 [1937])."

And further, in its opinion, the court stated: "Assuming that respondents in fact used skill and judgment in selecting the referrals, the trial court properly held that chance permeates the entire scheme." (p. 163.)

In the *Lavin* case (*supra*, p. 168) the court said: "That the scheme provides for the distribution of property is apparent on its face. That the persons among whom the distribution is to be made pay a valuable consideration for the chance when they purchase the cigars \* \* \* is settled by authority. (*Hull* v. *Ruggles*, 56 N. Y. 424.) Therefore, the only question presented by the case is whether the distribution is made by chance or not." The court stated (pp. 170): "Our statute, however, does not provide that the distribution must be by pure chance or by chance exclusively, but by chance" and further stated (pp. 170–171): "The test of the character of the game is not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game. \* \* \* Equally we think that a lottery does not cease to be such and becomes a mere contest because its result may be affected, to some slight extent, by the exercise of judgment."

The court discussed the case of *Public Clearing House* v. *Coyne* (194 U. S. 497) wherein the Postmaster-General's action in impounding the plaintiff's mail was upheld by the Supreme Court on the ground that the scheme of plaintiff was that of a lottery, and the court concluded (p. 174): "We think the distribution in this case is controlled by chance within the meaning of the statute and that, therefore, it is illegal. The scheme certainly falls far within the requisites of a lottery as defined by the Supreme Court of the United States in the *Public Clearing House* case, under a statute very similar to our own."

It is therefore apparent that the Washington law on lotteries is identical to that of New York in constitutional origin, statutory definition and judicial approach and interpretation. In giving its examples of the chance permeating the sales scheme the Washington court showed that the result was determined by factors beyond the control of the consumer victims.

The similarity of the facts in the case at bar with those involved in the *Leach* case is striking. The approach to the consumer is the same. Even the progression table cited by the court there is substantially the same as that testified to by the witness Lyons here.

Whether the respondents would use the given names, whether the " salesman " sent to visit the referrals would be a good one or mediocre, whether he would even get there (in the light of so much testimony as to broken dates), whether he would be enthusiastic or deliberately " spike the deal ", whether he would make side deals, whether the persons referred would enroll, whether both husband and wife would agree to enroll, whether the market was already saturated, whether the product offered to prospects would be the same already possessed by them — these and many other considerations were all factors which would influence the enrollment of prospects, and all were outside the control or influence of the consumers, particularly under the factual situations disclosed at the trial of this case. There were no rules or established standards that could be depended upon by the victims.

The Court of Appeals (17 N Y 2d 758) recently affirmed the determination of the Appellate Division, First Department, in *Matter of People* v. *Compact Assoc.* (22 A D 2d 129) where the court affirmed a judgment of injunction granted at a Trial Term pursuant to subdivision 12 of section 63 of the Executive Law. The facts in that case in no way were as heinous as those indicated at the trial of the case at bar.

One cannot contend that every plan to induce sales by giving credits for leads to sales to others is for that reason, *ipso facto,* illegal. It is only where, as here, the element of chance so permeates the scheme involved that it must be condemned as a lottery.

The respondents cite the 1965 amendment to subdivision 2 of section 402 (L. 1965, ch. 872) as authorizing the scheme here involved. The amendment must be construed to authorize compensation for leads to sales to others only in the conduct of a legitimate business and that is certainly not the case here.

The respondents' operation is not a legitimate business enterprise and the court finds that the respondents' scheme of so-called referral selling is a lottery within the purview of section 1370 of the Penal Law. It is also a public nuisance under section 1371 of the Penal Law, and falls within the interpretation of subdivision 12 of section 63 of the Executive Law as being persistently illegal.

The respondent Sterngass admittedly owned all of the stock of Quartz Unlimited of North American, Inc., a domestic corporation. This corporation was not licensed to do business under the Banking Law as a sales finance company.

Section 492 of the Banking Law reads: " 1. No person * * * shall engage in the business of a sales finance company in this state without a license " and defines a sales finance company as follows (§ 491, subd. 7): " ' Sales finance company ' means a person engaged, in whole or in part, directly or indirectly, in the business of purchasing or otherwise acquiring retail installment contracts, obligations * * * made by and between other parties, or any interest therein." Any unlicensed acquisition of such contracts is a violation of the Banking Law (*Matter of Household Credit Corp.* v. *Clark*, 19 Misc 2d 33).

It was proven that several of the retail installment contracts were assigned to Quartz by respondent ITM and in turn by Quartz to G. A. C. Funding, a licensed sales finance company, which paid Quartz for them. Respondent Sterngass thus is responsible for violating the aforesaid section of the Banking Law.

It was also shown that respondents Sterngass (as sole stockholder) and D'Agostino (as president), since January, 1966 did a substantial business through a foreign corporation unlicensed to do business in New York. The petitioner proved these transactions were consummated in New York.

The court finds that these acts were in violation of subdivision (a) of section 1301 of the Business Corporation Law. The respondents Sterngass and D'Agostino as well as their successors in interest as well as the foreign corporation Products Presentations, Inc. (Conn.) or its alter ego, Gilbert Industries (trade name), may not maintain any action on these contracts pursuant to section 1312 of the Business Corporation Law.

The transaction of business by this unlicensed entity through respondents constitutes additional persistent and repeated illegal practices within the meaning of the Executive Law.

Financial problems were created for the consumers by the respondents. Participants in the referral deal, at the urging of a friend, relative or neighbor, and who, in turn, similarly imposed

upon others, were both resented and resentful. The referral selling trick was actually a gold-plated deception.

Many illegalities, including those heretofore related, were involved in connection with this vicious scheme. Many people of limited means were the prey of rapacious and avaricious promoters. These victims now find themselves embroiled in straightened circumstances. Even the courts were imposed upon by the respondents and burdened with additional litigation. Trickery and perjury were used in some of these cases. The court is impelled by all of the circumstances to urge the Attorney-General to communicate with the proper authorities so that a thorough inquiry can be made into all phases of this plan of "sales" operation. The only possible hope in deterring others from the practice of swindling innocent consumers is the glaring light of public exposure.

The court makes the following findings:

1. The petitioner proved, and the respondents are guilty of, all the fraudulent practices alleged in the petition.

2. The respondents repeatedly and persistently violated subdivision 2 of section 402 of the Personal Property Law both before and after the 1965 amendment and that such illegal practices were for the perpetration of fraud.

3. The contracts were unconscionable within the meaning of section 2–302 of the Uniform Commercial Code and subdivision 12 of section 63 of the Executive Law and are unenforcible.

4. The respondents were guilty of persistent illegal acts in conducting a lottery and all contracts are "utterly void".

5. The respondents, Sterngass and D'Agostino, are guilty of persistently transacting business through an unlicensed foreign corporation and neither they, the foreign corporation nor its successors in interest may maintain any action on such contracts. Furthermore, these respondents should be enjoined from enforcing or aiding in the enforcement of such contracts.

6. That respondent Sterngass, through Quartz Unlimited of North America, Inc., illegally conducted the business of a sales finance company in this State.

### CONCLUSION

The relief requested by the petitioner for an injunction to effectuate the prevention of such fraudulent and illegal practices by any of the respondents is granted and the State of New York is awarded, pursuant to CPLR 8303 (subd. [a], par. 6), costs of $2,000 against respondent Rubin Sterngass, and the sum of $500 costs as against each of the respondents, Joseph Granda and Joseph D'Agostino.