In the Matter of LOUIS J. LEFKOWITZ, as Attorney-General of the State of New York, Appellant, v. BULL INVESTMENT GROUP, INC., et al., Respondents.

Third Department, November 7, 1974.

*Louis J. Lefkowitz, Attorney-General*, pro se (*William J. Kogan, Ruth Kessler Toch* and *Kenneth J. Connolly* of counsel), for appellant.

*William J. O'Hare* (*Michael A. Feit* of counsel), for respondents.

COOKE, J. The proceeding underlying this appeal was commenced by the petitioner pursuant to subdivision 12 of section 63 of the Executive Law seeking an order permanently enjoining respondents from continuing to conduct their business in a persistently fraudulent or illegal manner and providing for restitution of funds received in the course of such business. On June 8, 1972 an order to show cause returnable on June 23, 1972 was signed by a Justice of the Supreme Court and temporarily restrained respondents from conducting any business with regard to the promotion of the "Golden Book of Values". Subsequently, the temporary restraining order was vacated and the matter set down for trial which commenced on January 25, 1973.

Bull Investment Group, Inc. [hereinafter referred to as Bull] is a New Hampshire corporation whose activity in this State has consisted of the promotion of the "Golden Book of Values" through the creation of dealership franchises in several areas of the State. The individual respondents are the president and treasurer of Bull, Ronald W. Kimball, and its national director, James Sanford.

Petitioner contends that respondents' marketing techniques are tantamount to a fraudulent pyramiding scheme within the meaning of subdivision 12 of section 63 of the Executive Law.

The normal method of commencing operations in a given area was to sell dealership franchises through so-called "opportunity meetings". For Albany County the number of dealerships to be sold was set at 27. The format for the "opportunity meeting" is set forth in the operating manual and strict adherence to it was emphasized. That format not only provided the material to be presented to the prospective franchise owners during the meetings but also provided tips on how to utilize enthusiasm and curiosity-arousing techniques to get prospects to attend the presentation. The emphasis of these "opportunity meetings" was on the money-making potential of participating in various aspects of Bull's program.

The standard presentation in the operating manual explained that there were four ways in which to make money by joining Bull. The first was as an independent sales agent. As will be discussed *infra*, there is a substantial dispute between the parties about the role of the sales agent. For present purposes, it suffices to say that the sales agent was authorized to sell dealership franchises in any area where plans to promote the Golden Book of Values were operational. For each franchise sold at a cost of $2,500, the sales agent would receive a commission of $900. Working part-time, it was assumed that each sales agent would bring two prospects to each weekly meeting and that of eight such prospects contacted each month at least two would "enroll" or purchase dealerships. Thus the sales agent would earn a monthly commisison of $1,800 or $21,600 per year.

The second way of earning money was by purchasing a dealership for $2,500. Once the targeted number of dealerships for an area was reached (and no earlier), the dealers were authorized to sell advertisements in the Golden Book of Values to merchants in the trading zone. Ostensibly, the advertisements would offer purchasers of the golden book substantial savings on the merchandise or services so as to provide an incentive for the purchase of the book and for patronizing the merchant. Each advertisement would sell for $195 of which the dealer would retain 50% or $97.50 as his commission. Two such golden books were planned for the Albany area, each containing 115 advertisements. Thus, each of the 27 projected dealers would have the opportunity to sell eight advertisements and consequently earn $780.

The third way of earning money was the sale of the golden book itself or of "Value Cards" (credit-card-like in appearance) representing membership in Bull and entitling the holder to the benefit of offers contained in the golden book. Once the book was completed (and no earlier), the dealer was entitled to sell books or cards in any area where a book had been completed. The book or card would sell for $15 of which $12 would be the dealer's commission. It was anticipated that dealers would engage others to sell the books or cards at a cost of $4 per book sold and therefore the net profit per book sold would be $8. One of the dealers testified that he was told that even in a bad year a dealer would sell 3,000 books or cards. Assuming a daily sale of 17 books or cards or 500 a month, a dealer could earn $4,000 a month or $24,000 in a six-month period.

The final way of making money was through the over-ride system whereby Bull would pay each sales agent 10 cents for

each book sold by a dealer he recruited. Again, assuming a sale of two dealerships per month or 24 per year and a sale by each dealer of 3,000 books or cards, the sales agent would receive $300 per dealer recruited or $7,200. Under the examples used, full participation in Bull's program would return $53,580 to a dealer-sales agent on his $2,500 investment.

It is well settled that the definition of fraud under subdivision 12 of section 63 of the Executive Law is extremely broad and proof of *scienter* is not necessary (*Matter of State of New York* v. *Interstate Tractor Trailer Training,* 66 Misc 2d 678; *Matter of State of New York* v. *Bevis Ind.,* 63 Misc 2d 1088, 1090. See, also, *People* v. *Federated Radio Corp.,* 244 N. Y. 33, 38–39). It has been stated that " [t]he rule is clear that where one party to a transaction has superior knowledge, or means of knowledge not open to both parties alike, he is under a legal obligation to speak and his silence constitutes fraud." (*Matter of State of New York* v. *ITM, Inc.,* 52 Misc 2d 39, 48, citing *Noved Realty Corp.* v. *A. A. P. Co.,* 250 App. Div. 1).

Under established legal precedents and the undisputed facts here, respondents' conduct in the promotion of the Golden Book of Values has been prima facie fraudulent in several respects and the plan itself is inherently fraudulent.

Deliberately vague and misleading statements made to prospects to induce them to listen to a sales pitch have been condemned by this court (see *Matter of Lefkowitz* v. *E. F. G. Baby Prods. Co.,* 40 A D 2d 364, 368) and others as creating an atmosphere conducive to fraud, if not fraudulent in and of themselves (*Matter of People* v. *Compact Assoc.,* 22 A D 2d 129, 131, affd. 17 N Y 2d 758). The operating manual urges dealers not to go into details in contacting prospects but to " Use the Curiosity Approach * * * tell him you have seen a money tree and would like for him to take a look at it. Use the Advice Approach. * * * Tell your guest that you have seen the most fantastic opportunity of your lifetime and you would like him to attend a meeting with you and give you his personal opinion. This is an effective method for women approaching men, employees approaching employers, and young men approaching older men." Obviously since the dealers are already part of Bull, they would not be seeking advice at all but, with respondents' coaching, would be misleading prospects and using false pretenses to lure them to the " opportunity meeting." (See Executive Law, § 63, subd. 12; *Matter of Lefkowitz* v. *E. F. G. Baby Prods. Co., supra.*) Such conduct is prima facie fraudulent.

Next, although respondents have maintained throughout this proceeding that the roles of dealer and independent sales agent are separate and distinct, that a sales agent need not be a dealer and vice versa, that no investment was required to become a sales agent and that dealers who were not also sales agents could not recruit new dealers, these '' facts '' were apparently concealed from prospects attending the '' opportunity meetings ''. Nowhere in the standard presentation contained in the operating manual — strict adherence to which was required — are these distinctions explained. Several witnesses testified that they were told or led to believe at these '' opportunity meetings '' that they had to enroll as dealers and invest $2,500 in order to become independent sales agents. Nor can the importance of that distinction — if, indeed, there was one prior to the commencement of this proceeding[1] — be underestimated. The primary thrust of the meeting was the money-making opportunities available. Yet the very relevant fact that more than one half of the possible earnings ($21,600 + $7,200 = $28,800) required no investment at all, according to respondents' present claim, was not mentioned. And, since there was no investment, there could be no risk and no waiting period before such earnings could commence. On the other hand, dealers would be required to invest $2,500 but their potential earnings, as represented by respondents, would be the lesser sum of $24,780 and would require waiting until all dealerships allocated to an area had been sold, until both golden books were fully subscribed and sold. The risks were obviously greater. Yet, none of this is explained in the standard presentation in the manual. Clearly, unless rebutted, such conduct would amount to concealment and suppression as those terms are used in subdivision 12 of section 63 of the Executive Law.

Several witnesses testified that they were told or led to believe that the Attorney-General had approved of Bull's operation in this State. There is no dispute that such approval was not, in fact, given. Despite respondents' denials, a prima facie case of

---

1. Nowhere in the operating manual is the distinction between dealers and sales agents clearly set forth. Indeed, respondents' claim that dealers were not permitted to make sales of franchises is apparently belied by the manual which has a section on recruiting under the heading '' Specific Information For *Dealers* '' (emphasis supplied). That section describes how dealers should bring '' guests '' to '' opportunity meetings '' and illustrates the types of conduct on the part of the dealers before, during and after the meeting that were felt to be conducive to '' enrolling '' the prospects in the program. In sum, the attempted distinction sought to be drawn seems to be one without a difference.

misrepresentation within the meaning of subdivision 12 of section 63 has been established.

The most crucial fraudulent conduct on the part of the respondents and one which permeates its entire operating plan is the inherently and fundamentally unsound nature of its marketing methods and the mathematical certainty of failure at some point, knowledge of which is chargeable to respondents (*Matter of State of New York* v. *ITM, Inc.*, 52 Misc 2d 39, 47, *supra*).

In order to realize the earning potential represented to them at " opportunity meetings ", dealer-agents[2] would have to sell two dealerships per month. Since the dealership quota for Albany was set at 27, it is obvious that not more than one dealer-agent would be able to reach his total of 24 sales for the year. And, with each new sale he would be creating competition for himself for an already limited market. These inherent limitations were apparently not explained to " guests " at the " opportunity meetings ". Nor does the standard presentation require prospects to be told where they stood in relation to the total number of dealerships allocated for their area, a factor which obviously would affect their ability to earn the income that was represented as potentially available (see *Kugler* v. *Koscot Interplanetary*, 120 N. J. Super. 216, 233). Respondents were obviously in a better position to know and realize the impact of such information and had a concomitant duty to speak; their failure to do so would constitute fraud (*Matter of State of New York* v. *ITM, Inc.*, *supra*, p. 48; see, also, *Noved Realty Corp.* v. *A. A. P. Co.*, 250 App. Div. 1, *supra*).

Respondents attempt to escape that conclusion by contending that dealer-agents were not limited to making sales of franchises in their own area but could sell franchises in any part of the country where the golden book promotion was operational. Rather than aiding respondents' position this fact merely compounds the fraud. Not only do dealer-agents have to compete with their ex-customers for a small market, but they are subjected to the constant (and previously undisclosed) risk of competition from other dealer-agents from other areas. Establishing a quota for an area thus does not cure the vice of this type of a sales program. From the time the first sale is consummated, the law of diminishing returns inevitably applies to late participants. (*Kugler* v. *Koscot Interplanetary*,

---

2. As explained *supra,* there is a prima facie showing that to join Bull as an agent one had to be a dealer as well.

*supra*, p. 234.) Of course, the architects of the plan must be charged with knowledge of this result and their failure to disclose these inherent limitations upon the ability of new dealers to achieve the high earnings represented to them would constitute fraud (*Matter of State of New York* v. *ITM, Inc., supra*, p. 48; see *Kugler* v. *Koscot Interplanetary, supra*). Unlike pyramiding schemes wherein the fraud lies in the customer not being told of the practical and mathematical limits on the number of possible sales, the fraud here lies in the erection of actual limits on the number of sales but continuing to represent the possibility of high earnings which such limitations preclude.

Obviously, if dealer-agents were unable to sell the projected 24 dealerships in the course of a year, the amount of their income by way of an "over-ride" commission would be proportionately less than that represented. Their income would also be directly affected by the ability of each dealer to sell the estimated 3,000 books or cards. In order for that level of sales to be reached, 81,000 books or cards would have to be sold in the Albany area which in 1970 had a population of 286,742. In effect, this would require a sale to roughly every third person regardless of age, desire or financial ability. There is no evidence of the basis upon which respondents concluded that this high level of market penetration was possible for a book or card selling for $15. Yet, the standard presentation was such as to lead the listener to believe that building such a thoroughly effective sales organization was not difficult. Obviously, such a representation would be misleading (see *Kugler* v. *Koscot Interplanetary, supra*, p. 226).

From the foregoing, it is clear that, reading the facts in the light most favorable to respondents, petitioner nevertheless established a prima facie case of fraudulent conduct by the respondents within the meaning of subdivision 12 of section 63 of the Executive Law. Unless rebutted, such proof would warrant a directed verdict in favor of petitioner granting the relief sought. It was error to dismiss the proceeding at the close of petitioner's case. A new trial should be had to resolve the triable issues of fact (see CPLR 409, subd. [b]) and to afford respondents an opportunity to defend themselves against the allegations.

The judgment should be reversed, on the law and the facts, and a new trial ordered, without costs, and without prejudice to an application for a preliminary injunction should petitioner be so advised.

HERLIHY, P. J., SWEENEY, KANE and REYNOLDS, JJ., concur.

Judgment reversed, on the law and the facts, and a new trial ordered, without costs, and without prejudice to an application for a preliminary injunction should petitioner be so advised.