OPINION OF THE COURT
Edward J. Greenfield, J.
The Hertz Corporation has moved to quash a subpoena requiring it to make available a voluminous quantity of books *421 and records relating to that car rental company’s practices with respect to collision damage waivers (CDWs).
The motion raises some profound and disturbing questions about the powers of the Attorney-General and the courts to act with respect to what are claimed to be "excessive” prices for goods and services being charged in the business community.
The standard Hertz car rental agreement provides in pertinent part that while Hertz generally will assume responsibility for collision damage over and above $250, the customer will be responsible for the initial amount. Hertz asserts that as a result of demand by consumers, it modified the contract by providing that Hertz would waive the first $250 of collision damage as well if the customer would opt for the collision damage waiver. If the customer accepts the CDW at a fee of $2.50 per day, he or she will be covered for the initial $250 of damage as well.
This practice has caused some raised eyebrows, and the claim that the CDW fee charged to the customer is excessive. If, for example, a vehicle were to be rented out for 250 days per year, Hertz would collect $625 annually as CDW fees to cover a risk of damage not exceeding $250. It is obvious, of course, that not every rental car would sustain collision damage during the course of the year.
Initially, the practice of the charging of fees for CDWs by the rental car agency was put before the State Insurance Department to consider whether the offer of CDWs could be considered the sale of insurance, and thus subject to regulation by the department. The Department of Insurance advised the Attorney-General that charging the car rental customer for the CDW was not considered by it as offering insurance for a premium, as its waiver of the customer’s liability for a fee was not insurance under section 41 (1) of the Insurance Law and the department declined jurisdiction over the subject matter. (Cf., Kramer v Avis Car Leasing, Sup Ct, NY County, index No. 22344/82, affd 100 AD2d 987.) The Attorney-General, believing the $2.50 per day CDW charge to be excessive, then commenced an investigation of CDW practice, purportedly under the authority of Executive Law § 63 (12) and General Business Law § 349.
Executive Law § 63 (12) provides that: "Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the *422 carrying on, conducting or transaction of business, the attorney general may apply * * * to the supreme court of the state of New York * * * for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages”.
Fraud is defined to include any device, scheme or artifice to defraud, deception, misrepresentation, false pretense or promises "or unconscionable contractual provisions.” In connection therewith, under both this section and General Business Law § 349 (f) dealing with deceptive practices, the Attorney-General is authorized to issue subpoenas.
Hertz challenges the power of the Attorney-General to conduct such an investigation, and the propriety of the subpoena seeking information from its books and records, on the ground that the Attorney-General has no power to investigate for the ultimate purpose of asking the court to set limits on the prices and profits of a nonregulated business.
The challenged subpoena seeks all books and records covering an almost 18-month period which would disclose:
(1) the amount of CDW charges collected from each customer in New York State who rented a car on a short-term basis;
(2) the total number of CDW charges;
(3) the total number of cars on which CDW charges were collected;
(4) the number of such cars involved in collisions and all collision reports, repair bills and other documents disclosing the type, extent and costs of repairs to these cars.
Hertz takes the position that inasmuch as the subpoenaed records are concededly being sought solely for the purpose of demonstrating a gross disparity between what it charges for CDWs and what the CDW actually costs, the investigation goes well beyond the authority of the Attorney-General. The question is whether Executive Law § 63 (12), which deals with fraudulent and illegal activities, or article 22-A of the General Business Law, dealing with deceptive practices, the statutory authority relied on by the Attorney-General, clothes his office with policing authority over claims of excessive pricing and may serve as a statutory basis for the investigation.
The Attorney-General has the undoubted power to issue subpoenas in support of an investigation under section 63 (12) of the Executive Law. (Matter of La Belle Creole Intl, v Attorney-General of State of N. Y., 10 NY2d 192.) He does not *423 have the power to issue subpoenas if there is no valid basis for proceeding (Matter of Napatco, Inc. v Lefkowitz, 43 NY2d 884). So long as the books and records sought bear a reasonable relation to the subject matter under investigation and to the public purpose to be achieved, a subpoena incident to a lawful investigation will be upheld. There must, however, be some basis for the inquisitorial action, something more than a mere suspicion. (Matter of A’Hearn v Committee on Unlawful Practice of Law, 23 NY2d 916, 918.)
There is no question that the Attorney-General may legitimately conduct an inquiry into unlawful or fraudulent business practices. Here, however, the Attorney-General purports to act with respect to "unconscionable contractual provisions”. Hertz contends, and the Attorney-General concedes, that there is no fraud or unlawful practice in connection with charging for CDWs by Hertz. Hertz insists that authorization to the Attorney-General to take action as to fraud, deceptive practices or unconscionable contracts does not warrant an inquiry as to whether prices charged for a given service are too high. The Attorney-General, on the other hand, takes the position that a price charged to the customer well beyond actual costs to the business may render a contract unconscionable, so that his office, on suspecting a business of charging excessive prices, can properly conduct an inquiry into the price structure of a business. Thus, in this case, the alleged purpose of the inquiry is to demonstrate a disparity between the price paid by a rental customer for a CDW and the cost to Hertz.
As to a subpoena, "there is a real danger of abuse of power if its exercise is made to depend on shadowy complaints and surmises”. (Myerson v Lentini Bros. Moving & Stor. Co., 33 NY2d 250, 258.) The court there held that alleged complaints about gross disparities between estimates given and charges made were not a sufficient basis for inquisitorial investigation, in the absence of any objective pattern to suggest deceptive or misleading practices.
Hertz asserts that the information called for in the subpoena would require the production of millions of files and documents, purportedly so that the Attorney-General could ascertain the amount of each CDW, the number of rental cars involved in collisions, the collision reports, and the repair bills for rental cars over an 18-month period. Hertz alleges there were at least 1.5 million rentals during that period. Since Hertz asserts that such information is not readily accessible by computer, it would be a tremendous task to collect and *424 collate documents in order to permit the Attorney-General to ascertain if there is a wide gulf between the CDW charges and the actual collision repair costs, resulting in excessive profits to the rental agency.
Ordinarily, of course, the prices charged by private business to customers generally are not subject to governmental supervision under our political and economic structure, except in the case of specifically regulated industries, or upon the enactment of a broad structure of price controls in time of emergency.
It is argued, however, that excessive price alone may constitute "unconscionability”. The question here presented is whether a possibly excessive price can, without more, make a contract so unconscionable as to come within the purview of the Executive Law and the General Business Law to be monitored by the Attorney-General and the courts even when, as here, the charge involved is optional.
An "Unconscionable bargain” is defined by Black’s Law Dictionary as a bargain or contract "which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept on the other.” (Citing Hume v United States, 132 US 406.) The concept has been employed primarily in the area of consumer protection, in an attempt to deal with the " 'neverending stream of consumer gypsters and fraudulent operators, whose principal victims are the poor.’ ” (Mem of Governor Rockefeller, 1970 McKinney’s Session Laws of NY, at 3074.)
The doctrine of unconscionability was used by the courts, under their equitable powers, to void what was deemed a wholly unfair transaction. This judicial practice received statutory sanction with the adoption of section 2-302 of the Uniform Commercial Code, which permits a court to refuse to enforce a contract for the sale of goods if it finds it to be unconscionable at the time it was made.
The doctrine has been applied most frequently in areas where there is an inequality of bargaining power, and it has been used primarily to protect those who cannot protect themselves. (See, e.g., Graziano v Tortora Agency, 78 Misc 2d 1094; Triple D & E v Van Buren, 72 Misc 2d 569, affd 42 AD2d 841.)
In the advent of the consumer protection movement, the Attorney-General’s power to enjoin fraudulent or deceptive business practices was expanded by including within the scope *425 of Executive Law § 63 (12) not only fraud or fraudulent practices, but unconscionable contracts. It was the intention of the Legislature that unconscionability, in the context of section 63 (12), be defined and interpreted in conformity with its meaning in section 2-302 of the Uniform Commercial Code (1965 McKinney’s Session Laws of NY, at 2078) and both the courts and the commentators agree that fraud and unconscionability in the context of New York statutes and the UCC are designed to cover situations in which marked disparity in bargaining power between businesses and consumers imposes undue pressures upon the consumers to accept contractual terms which are grossly unfair. (See, 1 Anderson, Uniform Commercial Code, at 394-403 [2d ed 1970].) Can there be unconscionability in a situation in which there is no real disparity in bargaining power? Although gross "excessiveness” in price may be an element of unconscionability in cases where excessive price plays a part, such exorbitance of price is usually accompanied by some element of fraud, deception, coercion, or inequality between the parties. (See generally, Shanker and Abel, Consumer Protection Under Article 2 of the Uniform Commercial Code, 29 Ohio St LJ 689, 706 [1968].)
The courts have found unconscionability where other factors exist which clearly show that the gross price disparity is accompanied by deception or coercion. (See, e.g., Matter of State of New York v ITM, Inc., 52 Misc 2d 39 [high pressure sales tactics and false representations to consumers]; Frostifresh Corp. v Reynoso, 52 Misc 2d 26, revd on other grounds 54 Misc 2d 119 [consumers’ inability to speak or understand English, and misrepresentations by the seller]; Albert Merrill School v Godoy, 78 Misc 2d 647 [lack of education and limited English language ability on the part of consumers coupled with deception and misrepresentation].)
In State of New York v ITM, Inc. (supra), relied on by the Attorney-General for the proposition that high price alone can constitute unconscionability, there was an "endless-chain” transaction which consisted of (a) a retail installment contract calling for the purchase of a product and (b) a commission agreement providing for payment to the consumer of an agreed amount for each sale resulting for his submission of names. The court found that most participants would earn no commissions, that the promoters necessarily had knowledge of the inherent fraud and misrepresentation, inherent in the plan, and that high pressure sales tactics were used. The court specifically stated: "It is difficult to conceive of a more deliber *426 ately fraudulent and maliciously dishonest pattern of doing business with the public. They gorged themselves on their ill-gotten gains from highly credulous consumers. They engaged in practices in which duplicity was the keynote and fraud the keystone of a commercial enterprise designed to pillage the public. None has the right to earn his livelihood in this fashion. The Attorney-General not only had the right, but the most imperative duty to bring this action.” (52 Misc 2d, supra, at 52.)
The court further emphasized the factual context in which the issue of unconscionability must be viewed, in stating that: "It is clear that the referral sales scheme was basically a fraudulent scheme and that the representations made concerning it were factually false and misleading.” (52 Misc 2d, supra, at 49.)
Although the court in ITM, commenting on prices charged from 2 to 6 times cost, declared that "these excessively high prices constituted 'unconscionable contractual provisions’ within the meaning of subdivision 12 of section 63 of the Executive Law”, it noted that "even if the prices charged were not unconscionable per se, they were unconscionable within the context of this case” (52 Misc 2d, supra, at 53). The case does not support the proposition that prices charged well above cost constitute unconscionability per se. ITM (supra) was cited by Judge Wachtler in Jones v Star Credit Corp. (59 Misc 2d 189) for the proposition that a $1,234 price for a $300 freezer was unconscionable, but in that case there was clear overreaching by unscrupulous merchants preying on uneducated consumers and welfare recipients. While excessive price can be a signal, the touchstone of unconscionability is oppression.
In Morris v Capitol Furniture & Appliance Co. (280 A2d 775 [DC Ct App 1971]), it was explicitly held that price alone, absent one of the aggravating factors which indicates lack of meaningful choice, is an insufficient basis for a finding of unconscionability. (Accord, Lundstrom v Radio Corp., 17 Utah 2d 114, 405 P2d 339 [1965]; see also, Wilson Trading Corp. v David Ferguson, Ltd., 23 NY2d 398.)
In connection with the proposed inquiry here, the Attorney-General does not claim that any of the aggravating factors other than price which tend to establish unconscionability exist with respect to purchases of CDWs. The Attorney-General makes it plain that in this case his position is that *427 excessiveness of price alone constitutes unconscionability. Concededly, with respect to the CDWs there has been no deception, misrepresentation, or fraud.
We are told that the source of more than 85% of Hertz’ car rentals come from commercial business. Hertz renters, whether for business or personal use, generally use company or individual credit cards to charge their rentals, have economic stature, and are presumably well informed and equipped to determine whether to accept or decline CDWs. In fact, it appears that many corporate customers with experienced corporate travel departments direct their employees to purchase CDWs, whereas others elect to decline the waiver. In each case the decision as to whether to accept or reject CDWs is generally deliberate and informed; it is made by customers presumed to be cognizant of their own particular needs and circumstances. The Attorney-General’s office makes no claim that pressure tactics are used to force car rental customers to purchase CDWs. CDWs are clearly designated as an option in the rental agreement, and a substantial number of customers, in the free exercise of that choice, have rejected it. While there is some suggestion that the rental agreement may be a contract of adhesion (Weidman v Tomaselli, 81 Misc 2d 328, affd 84 Misc 2d 782), even though the customer may not have had the chance to shop around for a better deal, it is clear that the CDW option was not insisted upon as part of the rental, and the customer was not required to "take it or leave it.” (Cf., St. John’s Episcopal Hosp. v McAdoo, 94 Misc 2d 967.)
Since the Insurance Department has declined to treat the CDWs as a form of insurance subject to its regulation, I cannot accept the contention that prices charged by a private nonregulated business, even if they prove to be excessive, are within the scope of the Attorney-General’s investigative power, absent a showing of fraud or deception. It may be true that under Roman law prices could be set aside whenever the value of an item equaled less than one half the price. We live in an entirely different climate. The Attorney-General argues nevertheless that there is an implied representation that a charge imposed must have a reasonable relationship to actual cost.
The position flatly stated is "that any time the attorney general can reasonably demonstrate that the price is excessive” (i.e., too great a disparity between price and value), unconscionability can be found. Even if a local seller of fruit had been charging his customers much more than they cost *428 him, the Attorney-General insists it would, have the authority to inquire. If the Attorney-General were correct, he would become the overseer and policeman of our entire economic price structure, and the court, which is given the power to enjoin "unconscionable practices”, would become the ultimate arbiter of our price structure. The courts already have more than enough to do, without having to deal with innumerable cases in which they would have to determine whether a particular price for a particular commodity or service was "fair.” I cannot believe that the Legislature, in enacting section 63 (12) of the Executive Law or article 22-A of the General Business Law, ever intended such a result, giving the courts ultimate power over the fairness of our entire price structure.
If there are to be price controls, then it is for the Legislature and/or a regulatory body to impose them. We live in a quasi-capitalist society, where the economy is generally controlled by the law of supply and demand. With respect to certain services and commodities, prices are regulated, i.e., electricity, insurance rates, residential rents, etc. However, such regulation is the exception, not the rule, and in the absence of an explicitly declared intention to regulate prices or profits, it is not for the courts at the behest of the Attorney-General to set policy on permissible profits and thus encroach on what is clearly a legislative function.
One further comment is required. It is clearly the Legislature whose function it is in the first instance to decide policy questions, and for the courts to determine whether the regulation is reasonable and serves a legitimate public purpose (General Tel. Co. v United States of Am., 449 F2d 846).
Thus, the courts, in the exercise of their proper judicial function, have upheld, inter alia, rent control laws (Eisen v Eastman, 421 F2d 560, cert denied 400 US 841); the regulation of meat prices (Salsburg’s Meats v Shultz, 363 F Supp 269) and minimum and maximum prices for milk (Nebbia v New York, 291 US 502) as legitimate exercises of police power.
To read the Executive Law and the General Business Law as giving courts the implicit power to set economic policy is totally unwarranted. The court notes that the General Business Law itself purports to set various maximum prices, such as a $1.50 ceiling on the resale of tickets for amusements (§ 169-c). Where the Legislature acts, the court may subsequently exercise its judicial function in considering the stat *429 ute’s constitutionality (see, Gold v DiCarlo, 235 F Supp 817, affd 380 US 520, upholding the constitutionality of section 169-c). Where the Legislature has not acted, the courts may not intrude.
As the present inquiry must be deemed far beyond the powers conferred on the Attorney-General under either section 63 (12) of the Executive Law or article 22-A of the General Business Law, the motion to quash the subpoena is granted.