OPINION OF THE COURT
Richard M. Platkin, J.
Defendant Pharmacia Corporation moves for summary judgment pursuant to CPLR 3212, seeking dismissal of the complaint brought by plaintiff, the People of the State of New York (the State). Plaintiff cross-moves for partial summary judgment, seeking a ruling that Pharmacia violated General Business Law *370 § 349 and Executive Law § 63 (12) by causing false and inflated prices for its prescription drugs to be published and relied upon as a basis for reimbursement under certain government health programs. For the reasons that follow, neither side has established an entitlement to judgment as a matter of law.
Background
Pharmacia is a manufacturer of prescription drugs. Government health plans available in New York State — including the federal Medicare program, the joint federal-state Medicaid program, and the State’s Elderly Pharmaceutical Insurance Coverage (EPIC) program — rely upon the “average wholesale price” of prescription medications in providing reimbursement to pharmacies. The average wholesale prices (AWPs) used for this purpose were those reported in certain industry publications, which were based upon price reports made by prescription drug manufacturers, including Pharmacia.
By this action, which was commenced in February 2003, the State alleges that Pharmacia intentionally reported false and inflated wholesale prices for its products that did not reflect the actual drug acquisition costs of pharmacies. This conduct allegedly caused the State and certain Medicare consumers to pay higher prices for Pharmacia’s prescription drugs. The State alleges that defendant’s conduct runs afoul of General Business Law § 349, which prohibits deceptive consumer-oriented business practices, as well as Executive Law § 63 (12), which proscribes repeated acts of fraud or deception in the carrying on of a business.[1]
To aid in defending against these claims, Pharmacia sought the production of information and documents from state agencies and officials that allegedly would demonstrate that the State had long been aware that the industry-published AWP figures did not reflect the prices actually paid by pharmacies. This court (McCarthy, J.) denied Pharmacia’s motion to compel disclosure, holding that the requested materials were irrelevant to what the Legislature meant by the term “average wholesale price” used in the various reimbursement statutes.
On appeal, the Appellate Division, Third Department, affirmed, stating as follows:
“[The drug manufacturers] concede that the prices *371 they provided to the reporting services were not average prices actually paid by the pharmacies, but rather they were list wholesale prices before discounts. They maintain, however, that they did not represent the reported prices to be the prices actually paid, and the affected state agencies and officials knew this. However, regardless of what officials may have known, the causes of action against [the drug manufacturers] ultimately depend upon [the State’s] ability to prove that the Legislature intended the ‘average wholesale price’ to be based upon prices actually paid and that respondents were required to provide those prices rather than list prices to the reporting services. Because [the State’s] claims do not depend upon an allegation that agencies or officials were deceived, but rather that [the manufacturers] intentionally inflated the reported prices in order to manipulate and deceive the mandated statutory reimbursement formulae, any evidence that agencies or officials were aware of respondents’ failure to provide prices actually paid would be neither necessary nor material to their defense. It is, among other things, the statutory mandate that reimbursements be calculated based upon reported prices, regardless of what agencies or officials may have known about those prices” (39 AD3d 1117, 1118-1119 [3d Dept 2007] [emphasis added]).
Following an opportunity for pretrial discovery, Pharmacia now moves for summary judgment seeking dismissal of the State’s complaint. Pharmacia contends that there is nothing in the applicable statutes, legislative history or agency regulations that would permit the State to meet its burden of proving “that the Legislature intended the ‘average wholesale price’ to be based upon prices actually paid” (39 AD3d at 1119). Defendant further contends that the State cannot demonstrate that Pharmacia was “required to provide [prices actually paid] rather than list prices to the reporting services” (id.). With regard to the latter contention, Pharmacia observes that no federal or state law, rule or regulation imposes price reporting obligations upon it, much less establishes a requirement that it report “prices actually paid” rather than “list prices.” In addition, Pharmacia argues that the State’s claims are barred by the statute of limitations and that the Attorney General inappropriately relies upon General Business Law § 349 and Executive Law § 63 (12) “to seek Court-sanctioned price controls.”
*372 The State opposes defendant’s motion and cross-moves for partial summary judgment on the issue of Pharmacia’s liability under General Business Law § 349 and Executive Law § 63 (12) for causing false and inflated prices to be published and relied upon as a basis for reimbursement. The State argues that the plain language of the applicable statutes requires Pharmacia to report the prices actually paid at the wholesale level for its products. According to the State, Pharmacia admits that the prices it reported to industry publications did not meet this requirement and, instead, were intentionally inflated, allegedly for the purpose of increasing sales and maximizing profits. The State further argues that the other threshold defenses put forward by defendant are without merit.
Analysis
Summary judgment is a drastic remedy and should only be granted if there are no material issues of disputed fact (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395 [1957]). In evaluating a motion for summary judgment, a court should simply determine whether material issues of disputed fact preclude the grant of judgment as a matter of law (S.J. Capelin Assoc. v Globe Mfg. Corp., 34 NY2d 338 [1974]). The party moving for summary judgment has the initial burden of coming forward with admissible evidence to support the motion, so as to warrant the court directing judgment in movant’s favor; the burden then shifts to the opposing party to demonstrate, by admissible evidence, the existence of any factual issue requiring a trial (see Zuckerman v City of New York, 49 NY2d 557 [1980]). A. Statute of Limitations
As a threshold matter, Pharmacia argues that the State’s claims are barred by the applicable statute of limitations, which allegedly expired long before the State filed its complaint in February 2003. Specifically, Pharmacia contends that the State’s causes of action accrued no later than the 1980s, by which time state officials were well aware that published AWPs did not reflect pharmacies’ actual wholesale acquisition costs. Belatedly, Pharmacia argues that the State cannot rely upon the “continuing violation” doctrine to toll the statute of limitations.
There is no dispute that the State’s General Business Law § 349 claim is governed by a three-year statute of limitations (Gaidon v Guardian Life Ins. Co. of Am., 96 NY2d 201, 210 [2001]). However, the parties disagree as to the limitations period applicable to the State’s claim brought pursuant to Execu *373 tive Law § 63 (12). Pharmacia contends that this cause of action is subject to the same three-year limitations period that governs statutorily created liabilities, whereas the State contends that a six-year statute of limitations applies.
CPLR 214 (2) prescribes a three-year statute of limitations for “an action to recover upon a liability, penalty or forfeiture created or imposed by statute.” This limitations period does not “automatically apply to all causes of action in which a statutory remedy is sought, but rather only where liability ‘would not exist but for a statute’ ” (Matter of Meyer, 62 AD3d 133, 138 [1st Dept 2009], quoting Aetna Life & Cas. Co. v Nelson, 67 NY2d 169, 174 [1986]). Thus, the court must “look to the essence of plaintiffs claim and not to the form in which it is pleaded” (State of New York v Cortelle Corp., 38 NY2d 83, 86 [1975]).
Executive Law § 63 (12) allows the Attorney General to obtain injunctive relief, restitution and/or damages from any person who engages “in repeated fraudulent or illegal acts ... in the carrying on, conducting or transaction of business.” As used in this statute, the term “fraud” includes “any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions” {id.). Thus, Executive Law § 63 (12) applies to fraudulent conduct actionable at common law, as well as to conduct for which liability arises solely from statute.
An examination of plaintiff’s complaint reveals that the State’s allegations fall well short of alleging fraud actionable at common law. The State acknowledged as much in its written submissions and at oral argument. Thus, this is not a case in which the State simply is relying upon the generous remedies made available to the Attorney General under Executive Law § 63 (12), but rather one in which the State seeks to establish a liability that arises solely from statute. Under these circumstances, plaintiffs Executive Law § 63 (12) claim is governed by the three-year limitations period set forth in CPLR 214 (2) (compare State of New York v Daicel Chem. Indus., Ltd., 42 AD3d 301, 303 [1st Dept 2007] [“These claims rely on allegations of conduct made illegal by statute, and do not even allege all the elements of common-law fraud, and as such they are covered by CPLR 214 (2)”], with Cortelle, 38 NY2d at 87 [six-year limitations period for allegations amounting to “classic wrong on a common-law theory of promissory fraud, . . . (that) were wrongful prior to and independent of the Executive Law”]).
*374 Having concluded that the State’s claims are governed by a three-year statute of limitations, the issue then becomes whether the State may maintain this action with respect to Pharmacia’s conduct during the period from February 2000 through February 2003.[2] Even assuming that state officials had been aware since the 1980s that industry-published AWPs did not represent prices actually paid and that Pharmacia may rely upon such knowledge in establishing this affirmative defense (but see 39 AD3d at 1119 [“any evidence that agencies or officials were aware of respondents’ failure to provide prices actually paid would be neither necessary nor material to (Pharmacia’s) defense”]), the court does not find defendant’s argument to be persuasive. To the extent that Pharmacia violated General Business Law § 349 and/or Executive Law § 63 (12) by causing false and inflated AWPs to be published and relied upon by payors, each such inflated price report constitutes the accrual of a separate wrong. Thus, the State plainly is entitled to pursue damages for the three-year period preceding the commencement of this action on February 13, 2003.
Based on the foregoing analysis, the court concludes that the present action is not barred by the statute of limitations, but is limited to the three-year period from February 2000 through February 2003.
B. The Drug Reimbursement Statutes at Issue The State’s complaint relates to three government health care programs that rely upon AWP in providing reimbursement to pharmacies for dispensing prescription drugs:
1, Medicaid
Medicaid is a joint federal-state program that provides health care to eligible low-income individuals and families. Pursuant to federal law, reimbursement for prescription drugs dispensed by pharmacists generally is limited to the lower of the “[estimated acquisition costs [of the drugs] plus reasonable dispensing fees” or the “ [providers’ usual and customary charges to the general public” (42 CFR 447.331 [b] [1], [2]).
While federal law establishes a ceiling on Medicaid drug reimbursement, the precise amount of reimbursement is fixed by state law. Pursuant to the version of Social Services Law *375 § 367-a (9) (b) (ii) in effect at relevant times, the “estimated acquisition cost” for pharmacist-dispensed drugs without a Federal Upper Limit (FUL)[3] was defined as “the average wholesale price of a prescription drug . . . , as reported by the prescription drug pricing service used by the [Department of Health], less ten percent thereof.”[4] Thus, for pharmacist-dispensed prescription drugs with no FUL, the State reimbursed pharmacies based on the published AWP minus 10% capped at the pharmacy’s usual and customary charge to the public.
The use of AWP minus 10% as a measure of reimbursement for pharmacist-dispensed drugs without a FUL was enacted into law in 1994 (L 1994, ch 170, § 456). Prior to this enactment, which represented the first use of the term “average wholesale price” within the State’s Medicaid statutes, drug reimbursement rates were established administratively by the Department of Social Services (DSS), the state agency then responsible for Medicaid administration (see L 1990, ch 190, § 378 [adding subdivision (9) to Social Services Law § 367-a, which directed DSS to “establish payment levels for multi-source prescription drugs consistent with federal law and regulations”]).[5]
Although the term “average wholesale price” did not make its way into the Medicaid law until 1994, pharmacists already had been receiving reimbursement based upon average wholesale prices as a result of a litigation settlement with the State. In July 1978, the State stipulated to the settlement of a federal lawsuit brought by the Pharmaceutical Society of the State of New York, Inc. (PSSNY), which alleged that the State had provided inadequate levels of prescription drug reimbursement. Pursuant to the agreed-upon stipulation of settlement (the stipulation), the State agreed to reimburse pharmacies at their estimated acquisition cost, which was to be computed by reference to a state survey of the prices charged by the 12 largest drug wholesalers.
In an order dated December 12, 1991, the Federal District Court approved the State’s application to, inter alia, modify the stipulation to eliminate the requirement for the State to conduct *376 its own wholesale pricing survey. Instead, the State would be permitted to rely upon industry published AWP figures, reduced by 10%. On appeal, the Second Circuit found that the 10% reduction from AWT] allegedly necessary to comply with federal regulations, was unsupported by the record before the District Court, but left in place the use of published AWPs as the basis for reimbursement (see Still’s Pharm., Inc. v Cuomo, 981 F2d 632, 638 [2d Cir 1992]).
Ultimately, the enactment of Social Services Law § 367-a (9) in 1994, which established AWP minus 10% as a basis for Medicaid drug reimbursement, “represented a settlement between [PSSNY and the State], in the context of the Federal court litigation, as to the maximum payment authorized by Federal regulations” (Matter of Pharmaceutical Socy. of State of N.Y. v New York State Dept. of Social Servs., 223 AD2d 68, 62 [3d Dept 1996]).
2. EPIC
EPIC is a state program that assists the elderly in obtaining prescription medications. As originally enacted in 1986, EPIC used “average wholesale price,” reduced by five percent for large pharmacies and chains, as a measure of reimbursement (L 1986, ch 913 [adding Executive Law § 547-j]). While this legislation did not use the same “as reported” language as Social Services Law § 367-a (9) (b) (ii), the EPIC statute provides that “the list of average wholesale prices upon which such reimbursement is determined” shall be updated regularly “using nationally recognized and most recently revised sources” (former Executive Law § 547-j [2]). In early 2002, EPIC reimbursement for prescription drugs was amended to conform generally with Medicaid reimbursement (see L 2002, chs 1, 82).
3, Medicare
Medicare is a federal program that provides medical assistance to the elderly and the disabled. At times pertinent to this litigation, federal Medicare reimbursement to pharmacies was based on a specified percentage of the “average wholesale price” (42 USC § 1395u [o]; § 1395/ [a]; see also In re Pharmaceutical Indus. Average Wholesale Price Litig., 582 F3d 156, 163-177 [1st Cir 2009] [providing detailed legislative history of drug reimbursement under Medicare]). Medicare beneficiaries generally were obliged during the relevant time period to make a 20% copayment for covered prescription drugs.
C. The Parties’ Contentions Regarding AWP
*377 At the heart of this case is the State’s contention that the plain meaning of the term “average wholesale price,” as used in the Medicaid, EPIC and Medicare statutes, requires reimbursement for prescription drugs to be based upon an average of the wholesale prices actually paid by pharmacies, including any discounts, rebates, charge-backs or other price concessions. Belatedly, the State contends that Pharmacia was required to report the prices actually paid for its products to the third-party publishers.
In support of its complaint and motion for summary judgment and in opposition to defendant’s motion for summary judgment, the State relies primarily upon defendant’s response to first notice to admit. Pharmacia acknowledges therein that it provided the publishers with “wholesale list prices” (WLC) and “direct prices” for certain of its products at relevant times. These prices are claimed to represent the list prices charged by Pharmacia to wholesalers and other direct purchasers of its products, exclusive of “discounts, rebates, charge-backs, administrative fees or free goods.” While Pharmacia admits that these “list” prices did not necessarily reflect prices actually paid — since it acknowledges offering price concessions to certain customers at certain times — Pharmacia asserts that at least some of its products were offered to some wholesalers and direct customers at the reported WLC and/or direct prices.
Given that the WLC and direct prices reported by Pharmacia pertain to transactions between the drug manufacturer and its wholesalers — whereas AWP speaks to transactions between wholesalers and retailers — Pharmacia recognizes that the third-party publishers applied a “multiplier” to the WLC and direct prices to arrive at the published AWE This markup typically was 20% to 25%, a figure alleged by both sides to be reflective of historical wholesale markups in the pharmaceutical industry.
Pharmacia also acknowledges reporting “suggested AWPs” for certain drugs at relevant times. These “suggested AWPs,” which could be published directly by the data reporting services without adjustment, “did not reflect, and would not have reflected, the prices that health care providers and/or pharmacies that purchased . . . drugs directly from Pharmacia would have paid Pharmacia for such drugs.” However, Pharmacia states that it does not necessarily know whether sales to pharmacies and other health care providers were made at the “suggested AWP,” since data concerning these transactions resides with the wholesalers and retailers.
*378 Pharmacia makes several other admissions worthy of note. It acknowledges that the industry-published AWPs were not reflective of the prices actually paid by pharmacies to acquire its prescription drugs. And Pharmacia admits that it knew that the industry publications derived their reported AWPs from the pricing data it supplied, and that public and private payors, including the State, relied upon the industry-published AWPs in reimbursing pharmacies.
Thus, on this motion, the State argues that: (a) the plain meaning of the term “average wholesale price” refers to the wholesale prices actually, paid by pharmacies; (b) Pharmacia violated its obligation to report actual prices, inclusive of discounts, rebates and other price concessions and instead reported false and inflated prices; and (c) Pharmacia’s conduct caused pecuniary injury to the State in its own right as a Medicaid and EPIC payor and to Medicare consumers, on whose behalf the State also sues, who paid inflated copayments to purchase defendant’s products. The foregoing conduct, according to the State, constitutes a deceptive trade practice within the meaning of General Business Law § 349 and acts of repeated fraud and deception, actionable under Executive Law § 63 (12).
In support of its motion for summary judgment and in opposition to plaintiffs cross motion, Pharmacia argues that the State cannot meet its burden of establishing that the Legislature intended for AWP to be based upon prices actually paid. As to the State’s “plain meaning” argument, Pharmacia contends that if the Medicaid and EPIC statutes referred to actual acquisition costs, the statutory reimbursement rate of AWP minus 10% would cause pharmacies to lose money on every transaction: an absurd result at odds with the State’s obligation to ensure the availability of essential pharmaceutical services for low-income, disabled and elderly New Yorkers.
Pharmacia further argues that the State is unable to demonstrate that prescription drug manufacturers were required to report the wholesale prices actually paid by pharmacies to the third-party reporting services. According to Pharmacia, the statutes relied upon by the State do not even refer to drug manufacturers, let alone impose an affirmative duty on them to report the prices paid for their products at a different level in the distribution chain.
Finally, with respect to the branch of the State’s complaint based upon the Medicare program, Pharmacia asserts that there has been a national settlement reached in the federal multidis *379 trict litigation (MDL) that resolves the claims of Medicare beneficiaries who made prescription copayments during the time period relevant to this litigation. On that basis, defendant argues that the State lacks standing to maintain the Medicare claims in its parens patriae capacity.
D. Interpretation of Medicaid and EPIC Statutes
In any case involving a question of statutory interpretation, it is the duty of the court to “discern and give effect to the Legislature’s intent” (Matter of Ramroop v Flexo-Craft Print., Inc., 11 NY3d 160, 166 [2008]). “As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof’ (Majewski v Broadalbin-Perth Cent. School Diet., 91 NY2d 577, 583 [1998]). And “where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning” (Pultz v Economakis, 10 NY3d 542, 547 [2008] [internal quotation marks omitted]). Nonetheless, “courts should construe [statutes] to avoid objectionable, unreasonable or absurd consequences” (Long v State of New York, 7 NY3d 269, 273 [2006]).
The court begins, as it must, with the pertinent statutory text. With respect to the Medicaid program, the Legislature amended the statute in 1994 to establish a reimbursement rate based on the “estimated acquisition cost” of a prescription drug, which then is defined as “the average wholesale price [of the drug], as reported by the prescription drug pricing service used by the [Department of Health], less ten percent thereof’ (Social Services Law § 367-a [9] [b] [ii]).
The State asks the court to conclude that the foregoing language reflects a clear intention to base Medicaid drug reimbursement on an average of the prices actually paid by pharmacies to acquire prescription medications from wholesalers. Consequently, the State argues, drug manufacturers who reported prices to industry publishers were required to report the prices actually paid for their products at the wholesale level, inclusive of discounts, rebates and other price concessions.
The State contends that its interpretation follows directly from the plain meaning of the words “average wholesale price” — the “average” (i.e., mean) of the “prices” paid to acquire prescription drugs at “wholesale.” And the State contends, with some force, that this interpretation is consistent with the Legislature’s decision to use the term AWP as a surrogate for a drug’s “estimated acquisition cost.” The State fur *380 ther asserts that Pharmacia’s interpretation of the statute would leave prescription drug manufacturers free to obtain state reimbursement on the basis of fictitious reported prices that bear no relationship to the prices actually paid by pharmacies — an absurd result that could not have been intended by the Legislature.
As an initial matter, there is at least one obvious practical difficulty with the State’s proposed construction of the statute. Since drug manufacturers are not parties to the transactions between pharmacies and wholesalers, the question arises as to how Pharmacia would have access to the detailed transactional pricing data of its wholesalers that would be necessary to compile a true average of prices actually paid. The State responds that Pharmacia could have complied with the statute without the need for such data simply by reporting the prices actually paid by wholesalers for the medications, inclusive of discounts, rebates and other price concessions (i.e., the actual wholesale acquisition cost [AWAC]), with the industry publishers then free to inflate these reported prices by the “standard wholesale markup” of 20% to 25%. Alternatively, the State asserts that Pharmacia could have reported a “suggested AWP” to the publishers, so long as such prices were based on the AWAC and increased by no more than the “standard” markup.
But the State’s responses raise more questions than they answer. It acknowledges, at least implicitly, that drug manufacturers do not collect or maintain pricing data for all of the transactions between their wholesalers and retail outlets. That Pharmacia does not possess the pricing data that it allegedly was required to report counsels against the State’s interpretation of the statute.
More fundamentally, the State’s responses run counter to its basic theory of the case. If the Legislature did, in fact, intend for drug reimbursement to be based on prices actually paid at wholesale — and only actual prices — it is unclear why the State would countenance the inflation of AWAC by an arbitrary percentage that may bear little, if any, relationship to actual wholesale markups at any given time (see In re Pharmaceutical Indus. Average Wholesale Price Litig., 491 F Supp 2d 20, 33 [D Mass 2007] [finding, after a bench trial, that actual wholesale margins had been reduced to two or three percent over time], affd 582 F3d 156, 163-177 [2009]). And if such a markup nonetheless is acceptable to the State because it represents an industry “standard,” it is unclear why Pharmacia’s compliance *381 with other de facto standards would not be entitled to similar respect.
Even apart from the practical and theoretical difficulties raised by the State’s interpretation of the statute, its plain language argument is flawed. In amending the Medicaid statute, the Legislature did not simply declare that reimbursement shall be based on “average wholesale prices.” Nor did the Legislature impose obligations upon drug manufacturers (or anyone else) to report and/or compile actual wholesale prices. Instead, when the Legislature amended the Medicaid statute in 1994 to adopt an AWP-based reimbursement rate, it relied upon a preexisting industry-based system of drug price reporting and publication. And the Legislature left no doubt as to the source of the prices to be used for reimbursement. The statute commands in clear and unmistakable language that reimbursement shall be based on the “average wholesale price ... as reported by the prescription drug pricing service used by the [state Medicaid agency]” (Social Services Law § 367-a [9] [b] [ii] [emphasis added]). This is not a case, then, where it is necessary or appropriate to look at the dictionary meaning of “average wholesale price,” for the Legislature has told us precisely what it intended.
It therefore is unreasonable to conclude that in amending the Medicaid statute to base reimbursement decisions on the industry’s preenactment system of drug price reporting and publication, the Legislature also intended, sub silentio, to substantially alter the manner in which such price reports were compiled and to impose sweeping new responsibilities on prescription drug manufacturers. Indeed, such a conclusion would be at odds with the Legislature’s decision to embrace a national system of price reporting relied upon by other public and private payors. Rather, it is apparent that the Legislature necessarily accepted the prospect that industry standards and trade practices in effect prior to its decision to rely on published AWPs may have left such prices an imperfect measure of pharmacies’ actual acquisition costs — whether due to outdated assumptions regarding wholesale markups, a widespread and well-known industry practice of reporting and publishing undiscounted “list” prices, or other practices in the trade that may have been within the reasonable contemplation of knowledgeable industry participants at pertinent times.
Thus, while the State is correct that we must strive to give effect to the plain meaning of the Legislature’s enactment, it errs *382 in failing to read the enactment as a whole. The State’s approach gives primacy to the term “average wholesale price,” but disregards the import of the language that follows, which expressly defines the term AWP by reference to industry publications. And the State’s interpretation also fails to give sufficient consideration to the circumstances surrounding enactment of the statute.
Given the explicit textual linkage between the term “average wholesale price” and the industry published price reports, the State’s Medicaid statute therefore is distinguishable in an important respect from the Medicare statute at issue in the federal multidistrict litigation before the United States District Court for the District of Massachusetts (MDL Court). That statute simply provided that reimbursement shall be made on the basis of “average wholesale prices.” In rejecting the drug manufacturers’ argument that the term AWP, as used in the Medicare statute, was intended to refer to the industry published prices, the First Circuit explained:
“It is a stretch to point to [Medicare’s] legislative history and statutory context for the proposition that AWP was a term of art in . . . referring to the prices appearing in the industry publications. . . . Congress at no point adopted such a definition explicitly. On the contrary, both the DHHS regulation promulgated in 1991, which we assume Congress was aware of in 1997, and the [statute] itself referred to the ‘average wholesale price’ without reference to the industry publications.” (See In re Pharmaceutical Indus. Average Wholesale Price Litig., 582 F3d at 169-170.)
There is no need to “stretch” here, since the State’s Medicaid statute expressly refers to the prices appearing in industry publications.
In its “plain meaning” analysis, the MDL Court also relied upon the principle that statutory language will be given its plain meaning, and will not be read as a term of art, where there is no clearly established meaning within the relevant trade. However, this canon of statutory construction has no application where, as here, a statutory term is defined by reference to its usage within a particular trade (see People v Dug-gins, 3 NY3d 522, 527-528 [2004]).
The same conclusions regarding the interpretation of the term AWP follow under the EPIC program. Although Executive *383 Law § 547-j (1), which was enacted into law in 1986, does not include the “as reported by” language used in the Medicaid statute, it does provide that EPIC reimbursement shall be based on a list of average wholesale prices to be compiled and updated based upon “nationally recognized . . . sources.” (Executive Law § 547-j [2].) The latter is a clear reference to the industry pricing publications. Moreover, the Legislature did not revisit this aspect of the EPIC statute when it amended the Medicaid statute in 1994 to codify the State’s reliance on published AWPs, or in early 2002 when the Legislature amended EPIC to bring its drug reimbursement methodology into general conformity with Medicaid. This further supports the conclusion that the term AWP in both state statutes was intended to have the same meaning.
For all these reasons, the court cannot accept the State’s argument that in enacting the Medicaid and EPIC statutes, the Legislature intended to adopt a pure “prices actually paid” system of reimbursement without regard to the price reporting and publishing standards and customs then existing within the industry.
This does not mean, however, that the court can accept the full sweep of defendant’s argument, which appears to boil down to the remarkable proposition that the Legislature delegated responsibility for Medicaid and EPIC drug reimbursement to the pharmaceutical industry, and that drug manufacturers were thereafter free to report whatever prices and obtain whatever level of reimbursement they desired.
In adopting a prescription drug reimbursement methodology based on a preexisting industry system in which manufacturers self-reported prices to private publishing companies, the Legislature embraced a system with some obvious virtues, such as ease of administration and conformity with other government and private payors. At the same time, this system came with an equally apparent vice: it left important pricing data with significant state fiscal implications in the hands of an industry with an economic interest in maintaining and increasing spending on prescription drugs.
But while the Legislature necessarily embraced an imperfect system — one in which industry customs and practices apparently had resulted in the inflation of published AWPs over actual wholesale acquisition costs to some extent — it does not follow that Pharmacia was free to unilaterally alter its postenactment price reporting practices to increase the “spread” in whatever manner and to whatever extent it desired.
*384 After all, Pharmacia knew that the publishers would rely upon its reported prices to compile and publish AWPs. Pharmacia also knew that public and private payors, including the State, would rely upon the published AWPs in paying pharmacies. It was further apparent that increasing the “spread” would cause additional government funds to be spent on prescription drugs (though, as noted below, the precise benefit that this may have conferred upon Pharmacia is unclear from the present record).
Pharmacia makes much of the fact that the Legislature did not impose a legal duty upon it to report any pricing data, much less actual prices. But having voluntarily undertaken to report the prices of its products,[6] and knowing that published prices derived from such reports would be relied upon by the State and other payors, Pharmacia had an obligation to refrain from reporting prices in a fraudulent or deceptive manner or causing fraudulent or deceptive prices to be published. Certainly, Executive Law § 63 (12) and General Business Law § 349 are sufficiently broad so as to proscribe Pharmacia from causing false and inflated prices for its products to be published in order “to manipulate and deceive the mandated statutory formulae” into providing excess state reimbursement (39 AD3d at 1119).
Accordingly, a more sensible interpretation of the Legislature’s command to reimburse on the basis of the published AWP, and the concomitant obligations imposed upon drug manufacturers with respect to price reporting, can be found through examination of the conditions existing at the time of statutory enactment (see People v Litto, 8 NY3d 692 [2007]). Having chosen to embrace an industry-based system of pricing reporting, it is appropriate to consider the customs, practices and reasonable expectations of industry participants at such time (see McKinney’s Cons Laws of NY, Book 1, Statutes § 127, at 264; see id. § 233, at 397 [“When terms of art . . . aré used, it is supposed that the Legislature had in view the subject matter about which such terms or phrases are commonly employed”]).
And state officials were not without experience in using average wholesale prices as a basis for prescription drug reimbursement. After all, the State established its own process of collecting average wholesale prices as a result of the 1978 stipulation in the PSSNY litigation. And two years prior to the enactment *385 of Social Services Law § 367-a (9) (b) (ii), the State succeeded in obtaining a modification of the stipulation that allowed it to use industry published AWPs as a basis for reimbursement. Further, the legislative history of the 2004 Medicaid legislation demonstrates that numerous state agencies and officers with expertise in the area of health care financing had analyzed the fiscal implications associated with the use of the industry published prices under whatever magnitude of “spread” then was in effect.[7]
The foregoing should not, of course, be misconstrued as reviving the issue of subjective government knowledge, which has been held to be neither necessary nor material to this action (39 AD3d at 1118-1119). The issue is not what individual legislators or executive branch officials knew about the “spread” between published AWPs and the prices actually paid by pharmacies for prescription drugs. Rather, the pertinent inquiry involves construction of the statutory term AWP — expressly linked by the Legislature to industry prices — by reference to the preenactment standards and practices within the reasonable contemplation of knowledgeable industry participants.[8]
Thus, this court rejects both the State’s strict “prices actually paid” interpretation and Pharmacia’s “AWP means whatever price is published” alternative. Instead, Pharmacia’s conduct must be measured against the industry standards and reasonable expectations of market participants at the time of the Legislature’s decision to base reimbursement on industry published AWPs. To the extent that Pharmacia simply continued to carry forward its preenactment reporting policies and practices consistent with then-established industry standards and expectations, the court sees nothing inherently deceptive or fraudulent in its conduct. However, to the extent that Pharmacia intentionally inflated the reported prices of its drug prices over time to increase the “spread” between published AWPs *386 and actual acquisition costs following the Legislature’s adoption of AWP as a basis for drug reimbursement, its conduct may run afoul of Executive Law § 63 (12) and/or General Business Law § 349. Pharmacia may also face liability for misrepresenting the nature of the pricing data it provided to the third-party publishers under established principles of consumer protection law.
Accordingly, the court has no occasion to delve into the parties’ dueling “absurdity” arguments, by which each side contends that the other’s interpretation of AWP would “arrive at an unreasonable or absurd result” (Williams v Williams, 23 NY2d 592, 599 [1969]; see People v Santi, 3 NY3d 234, 242 [2004]). Properly construed, the State’s drug reimbursement statutes do not require pharmacies to be reimbursed at levels that would cause them to lose money on every transaction nor permit drug manufacturers to unilaterally establish whatever “spread” they desire.[9]
While the court therefore declines to adopt the pure “prices actually paid” standard advocated for by the State, it concludes that a narrower version of the State’s claims may be viable. In this connection, the court notes that such a conclusion is consistent with the decision and order of this court (McCarthy, J.) dated July 19, 2006, which states that plaintiff may be able to succeed on a theory that “[Pharmacia] improperly manipulated the prior practice of reporting ‘list’ prices by substantially increasing the ‘spread’ to increase sales even if the Legislature was aware of and accepted the mildly inflated pricing when it established the reimbursement formulae.”
Further, despite important differences in reimbursement statutes, the foregoing conclusions are consistent in key respects with the analysis ultimately applied by the MDL Court. Although the New York State courts are not bound by the holdings of the lower federal courts (see generally People v Kin Kan, 78 NY2d 54 [1991]; see also Matter of Kryzan v New York State *387 Bd. of Elections, 55 AD3d 1217 [3d Dept 2008]), this court has reviewed the thoughtful and comprehensive decisions issued by Judge Saris in the multidistrict litigation, as well as the First Circuit’s carefully reasoned analysis affirming her determinations in all respects pertinent to this action.
In a summary judgment ruling issued in November 2006, the MDL Court adopted the same position advanced by the State in this action: “average wholesale price” is not a term of art, and its plain language refers to the prices actually paid by pharmacies, inclusive of discounts, rebates and other price concessions (In re Pharmaceutical Indus. Average Wholesale Price Litig., 460 F Supp 2d 277, 287-288 [2006]).[10] However, as the First Circuit recently confirmed, the MDL Court’s ultimate findings of liability on the part of pharmaceutical manufacturers after trial did not rely upon
“this specific definition as a trigger for liability . . . [I]t rooted its ultimate liability finding not in the fact that spreads violated the ‘plain meaning’ of ‘average wholesale price,’ but instead in the fact that, inter alia, the spreads exceeded industry expectations . . . Thus, for purposes of this appeal, it is unnecessary to decide whether the term ‘average wholesale price’ admits of no spreads at all, as the district court appears to have concluded in its November 2006 order, or whether instead it admits of modest spreads (such as those created by prompt-pay discounts or formulaic markups from other published prices): whatever the correct interpretation of ‘average wholesale price’ in the [Medicare statute], it in no way countenanced spreads in excess of the industry expectations” (582 F3d at 171-172; see 491 F Supp 2d at 32, 97 [decision after trial] [“What Congress understood and intended AWP to mean is not the same as what the industry understood. . . . Because information about the 20 to 25 percent spread was widespread in the industry, a violation of the Medicare statute by publishing an ‘AWP’ that was not a true average of wholesale prices does not trigger per se liability”]).
Thus, the MDL Court ultimately declined to apply the per se rule advocated for by the State here and instead adopted a more *388 flexible standard that looked to the magnitude and duration of the “spread” between actual and published prices, the reasonable expectations of industry participants, the manner in which the “spreads” were created, and the existence of proof showing that drug manufacturers attempted to derive pecuniary benefit from the “spread” (491 F Supp 2d at 101-102). A finding of liability for deceptive or fraudulent conduct ultimately depends upon the “particular circumstances of each manufacturer and each drug for each year,” and that “no single factor is necessarily determinative” (id. at 102).
Unfortunately, the present record sheds little light on many of the issues necessary to resolve the merits of the parties’ competing claims to judgment as a matter of law. While the State relies generally upon Pharmacia’s admissions, it fails to come forward with proof demonstrating that the prices that Pharmacia reported and caused to be published were inconsistent with well-established industry practices at pertinent times. Further, the court will require particularized proof regarding the prices of specific prescription drugs, whereas the present record does not even establish the “spread” for any Pharmacia product.
Also missing from the present record is evidence regarding Pharmacia’s pricing policies and practices at pertinent times. Prior to finding that Pharmacia engaged in fraudulent or deceptive business practices with respect to its price reports, it is appropriate to consider, among other things, information concerning the extent to which sales of Pharmacia products were made at list prices, changes in discounting, rebating and other pricing strategies over time, the basis for Pharmacia’s “suggested AWP” figures, other factors that affected the “spread” for its products, conduct on the part of Pharmacia directed at exploiting the “spread,” and a plausible theory as to how Pharmacia derived an economic benefit as a result of increased spreads.[11]
Further, while the record contains some general information concerning the prices reported by Pharmacia to the publishers, it does not disclose precisely what pricing data Pharmacia was asked to provide by the data reporting services, what these prices were reasonably understood to mean, and how the *389 publishers themselves characterized the pricing data that they provided to the State and other subscribers.
Based on the foregoing,[12] it is apparent that this case is not in a posture where judgment as a matter of law can be granted to either side with respect to the claims arising out of the Medicaid and EPIC statutes. Further, given the variety of factors that must be considered in assessing Pharmacia’s pricing and reporting practices and the fact-intensive nature of the inquiry, it may well be that even following an opportunity for additional disclosure, which the court hereby grants, this case will not be one that is amenable to a summary resolution and will instead require a plenary trial.
E. Medicare
Unlike plaintiffs claims pertaining to the Medicaid and EPIC programs, which involve an effort to recover state funds paid out to pharmacies on the basis of Pharmacia’s alleged ^fraudulent and deceptive conduct, the Medicare program does not implicate the expenditure of state funds. The federal government pays for the bulk of its costs, with consumers responsible for making specified copayments for prescription drugs, ordinarily 20%.
At oral argument and again in its supplemental submissions, Pharmacia represents that it has arrived at a national settlement of all claims by Medicare beneficiaries who made copayments for its products during the time period relevant to this action. According to Pharmacia, approval of this class action settlement is pending before the MDL Court. On that basis, defendant contends the State lacks standing to maintain parens patriae claims on behalf of Medicare consumers. The State has had the opportunity to respond to these contentions, but has not come forward with evidence or argument calling defendant’s representations into question.
Under these circumstances, the court concludes that the most appropriate course of action is to deny both sides’ motions for *390 summary judgment with respect to the Medicare program without prejudice, subject to renewal in the event that claims of New York Medicare beneficiaries against Pharmacia are not resolved by settlement.
Conclusion
Based on the foregoing, the court concludes that the parties’ motions for summary judgment must be denied.
Accordingly,[13] it is ordered that defendant’s motion for summary judgment is denied in accordance with the foregoing; and it is further ordered that plaintiffs motion for summary judgment is denied in accordance with the foregoing; and it is further ordered that the parties shall confer regarding the need for additional disclosure and shall, within 30 days from the date of this decision and order, either: (i) stipulate to a discovery order, which shall be submitted to the court for approval; or (ii) request a conference with the court after complying with the consultation requirements of Rules of Practice for the Commercial Division (22 NYCRR 202.70 [g]) rule 8.

. Plaintiffs complaint originally included three additional causes of action, which were dismissed at the outset of the case (see decision and order of June 1, 2004 [Benza, J.]).

. At oral argument, the State disclaimed any reliance upon the “continuing wrong” doctrine to extend the temporal scope of its claims back beyond the applicable limitations period. And the State further represented that it was not pursuing claims for conduct occurring subsequent to the February 13, 2003 commencement of this action.

. The FUL caps the amount that Medicaid will pay for certain drugs at “150 percent of the published price for the least costly therapeutic equivalent” (42 CFR 447.332 [b]).

. Medicaid reimbursement for physician-administered drugs is set at “the actual cost of the drugs to the practitioners” (Social Services Law § 367-a [9] [a]). As such, these drugs are not at issue in this action.

. The Department of Health has since been designated the single state agency for Medicaid administration in New York State.

. Given the widespread use of the industry price reports, a decision by Pharmacia to decline to report its prescription drug prices to the industry publishers would likely have rendered its products ineligible for reimbursement under numerous government and private insurance programs.

. To similar effect is the legislative history of an earlier bill that would have based Medicaid reimbursement on published AWPs (see Veto Jacket, Veto 16 of 1992).

. The MDL Court appears to have recognized the force of this approach to statutory construction (see 491 F Supp 2d at 97 n 72 [“Interestingly, the 20 to 25 percent markup of AWP was well known in the industry at the time the BBA was enacted in 1997. As such, this practice is arguably relevant in construing the meaning of the statutory term AWE Defendants never made this argument. Rather, defendants’ proposed statutory interpretation that Congress intended AWP to be a blank check to the industry to impose whatever markup it wanted is supported nowhere in the legislative or trial record”]).

. In any event, there is a fine line between invocation of the absurdity doctrine and the duty of the courts to “decline[ ] to second-guess the policy choices made by the Legislature” in favor of “adhering to the literal terms of the statute” (Flores v Lower E. Side Serv. Ctr., Inc., 4 NY3d 363, 367 [2005]). While one can certainly second-guess the Legislature’s decision to tie prescription drug reimbursement to an industry-based system of price reporting of which it may not have been entirely familiar, there is no legal impediment to the Legislature so doing, provided it speaks in a clear voice regarding its policy choice. Likewise, given the complexity of health care financing and economics, the State’s contention that a pure “prices actually paid” interpretation could drive down prescription drug costs on a market-wide basis cannot be dismissed out of hand.

. Interestingly, the MDL Court did conclude that by 2003, the term AWI) as used in the relevant federal statute, had become a term of art (460 F Supp 2d at 288).

. With respect to the latter point, the court notes that unlike physician-administered drugs, where a physician could obtain the fiscal benefits of an increased “spread” through the drugs that he or she chooses to prescribe, the practices at issue in this action involve the reimbursement obtained by pharmacies for filling prescriptions written by others.

. Pharmacia’s remaining contention, that neither General Business Law § 349 nor Executive Law § 63 (12) authorize the Attorney General “to seek Court-sanctioned price controls,” merits little discussion. To be sure, the Attorney General has no power to act as an “overseer and policeman” of prices, and nothing in law gives him (or the Judiciary) “the power to set economic policy” (Hertz Corp. v Attorney-General of State of N.Y., 136 Misc 2d 420, 428 [Sup Ct, NY County 1987]; see Zuckerman v BMG Direct Mktg., 290 AD2d 330 [1st Dept 2002]). But this action does not seek to limit the amount that Pharmacia can charge for its products; rather, the Attorney General seeks to prevent the State and other consumers from paying higher prices as a result of false and inflated reported prices.

. The court has considered the parties’ remaining contentions and finds them unavailing or unnecessary to the disposition of the instant motions.